**TEXAS INSTRUMENTS INCORPORATED,**
Appellant,

v.

**The UNITED STATES, Appellee.**

**No. 90–1194.**

United States Court of Appeals,
Federal Circuit.

Dec. 21, 1990.

Rehearing Granted in part and Opinion Modified March 19, 1991.

Kathy C. Weinberg, Doke & Riley, Dallas, Tex., argued for appellant. With her on the brief were Marshall J. Doke, Jr. and Claudia E. Decker, Dallas, Tex.

Jane W. Vanneman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Joan M. Bernott, Sp. Litigation Counsel, Dept. of Justice, Washington, D.C., were on the brief for appellee.

Before MARKEY, NEWMAN, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Texas Instruments Incorporated ("TI") appeals the final decision of the Armed Services Board of Contract Appeals ("ASBCA") that "the amount of $628,069 is determined to be a fair and reasonable price for [Contract] Modification PK0005." *Texas Instruments Inc.*, 90–1 BCA (CCH) ¶ 22,537, at 113,097, 1989 WL 222693 (ASBCA Sept. 29, 1989) ("*TI* II"). In an earlier non-final decision, upon cross-motions for partial summary judgment, the ASBCA had determined that TI and the Administrative Contracting Officer ("ACO") had not reached a final binding agreement on a price of $672,067.86 as reflected in a Price Negotiation Memorandum ("PNM") signed by the ACO. The ASBCA held that the PNM was not a "final decision on the price of the order" and did not effect a "commitment by the Government to a price on which [TI] could reasonably have relied." *Texas Instruments, Inc.*, 87–1 BCA (CCH) ¶ 19,394, at 98,079 (ASBCA Sept. 17, 1986) ("*TI* I"), *reh'g denied*, 87–2 BCA (CCH) ¶ 19,767 (ASBCA Jan. 14, 1987). Since the ASBCA erred in holding that the ACO lacked authority to enter into a binding agreement, and the unchallenged facts demonstrate the existence of final binding agreement, we reverse.

## I

Contract No. F19628–77–C–0126, for the supply of tactical photographic interpretation equipment and supporting materials, was awarded to TI on May 27, 1977, by the U.S. Air Force. The contract provided that unpriced line items were to have their firm fixed price bilaterally negotiated after issuance of an order for the item. The Government issued Provisioned Item Order PK0005 on September 30, 1980, with a "not-to-exceed price" of $672,067.95. Ms. Ruby Hill, the ACO, assigned Mr. Jim Jeppe, to meet with TI's representative, Mr. Alan Johnson, to negotiate a price. Prior to meeting with Johnson, Jeppe reviewed the price analyst's report, the audit reports and, along with Hill, defined the Government's objective. On August 24, 1981, after three days of discussion, the two representatives arrived at a firm fixed price. Johnson wrote a letter to Jeppe stating that, as of August 24, TI "agrees to a firm fixed price of $672,067.86." Johnson also submitted an executed Certificate of Current Cost or Pricing Data that referred to the negotiated price.

Regulations governing procurement by negotiation require that the "contractor shall be required to submit only one certificate which shall be submitted as soon as practicable after agreement is reached on the contract or modification price." DAR § 3–807.6(a); 32 C.F.R. § 3–807.6(a) (1982). In the absence of such a certificate, "the contracting officer shall withhold making the award or price adjustment." DAR § 3–807.5; 32 C.F.R. § 3.807.5 (1982); *see also* § 3–807.3(b) ("certification is required prior to: (1) the award of any negotiated contract (except for unpriced actions such as letter contracts) expected to exceed $100,000 in amount"); 41 U.S.C. § 254(d) (certification that pricing data in non-bid contracts or modifications are accurate, complete and current).

On September 15, Jeppe prepared a PNM reviewing the events that led to the negotiation of the price. Preparation of a PNM after completion of a price negotiation is required by the Defense Acquisition Regulations. DAR § 3–811; 32 C.F.R. § 3–811 (1982). A PNM is an internal document not transmitted to the contractor. In non-bid, negotiated contracts, the PNM must refer to the contractor's submitted certificate of cost or pricing data. *Id.* Jeppe noted that such a certificate had been submitted. The PNM further stated that "[t]he negotiated amount of $672,067.86 is considered fair and reasonable" and that "[f]unds have been obligated as follows" with a reiteration of the negotiated amount. Underneath Jeppe's name as author, the PNM had a signature block which contains Hill's signature and which reads:

APPROVED BY:

RUBY L. HILL

Administrative Contracting Officer

The ASBCA found that "[t]he PNM had to be acceptable to Ms. Hill before she would sign it" and that "[t]he PNM was submitted to, and approved and signed by Ms. Hill, the ACO." At the time they

signed the PNM, both Jeppe and Hill considered the amount negotiated to be a fair and reasonable price. *TI* I at 98,073 (Finding 11). Jeppe and Johnson had negotiated several previous provisioned items. In each instance, the ACO had issued a Standard Form 30 ("SF–30") confirming the agreed upon price following the negotiation and submittal of an appropriate certificate. Jeppe visited the TI plant on September 28, after preparing the PNM and obtaining the ACO's approval. Johnson stated in a sworn affidavit not disputed by the Government that during a conversation with Jeppe on September 28, Johnson was told to submit a new Certificate of Current Cost or Pricing Data as the caption had been incorrect on the first one. TI forwarded a second executed certificate on October 2. Unbeknownst to TI, events following this meeting on September 28 succeeded in derailing the issuance of an SF–30 by the ACO. First, Jeppe and other Government personnel examined the electronic equipment provisioned by the order. They believed that the cost was not justified by the apparently simple design, but they were mistaken in believing the design to be simple. *TI* II at 113,090–091 (Finding 19–21). Second, Jeppe was informed that costs for work on software development of the electronic equipment had been allocated to an earlier contract. This information was also wrong. *Id.* (Finding 19, 22–23).

Finally, and also unknown to TI, the Department of Defense had established an internal audit procedure whereby all contract administration actions taken by ACO's were subjected to review by Contract Management Boards of Review ("Review Board"). Neither Jeppe nor Hill had discussed this review procedure with TI. Jeppe later noted that "[t]his review is required for proposed contracts of this type over $250,000, and is required before the Government and contractor enter into a formal (signed) contract." ASBCA found that the ACO "was not free . . . to utterly ignore the review process." *TI* I at 98,079. "She was obliged, instead, to await the [Review] Board's report and, prior to proceeding with the pricing of the order, to give due and careful consideration to any recommendations made therein." *Id.* Review Boards are authorized under two pub-

lished regulations, DAR § 23–104 and DAR § 8–600, neither of which concern contracts to be negotiated by an ACO. 32 C.F.R. §§ 8–600, 23–104 (1982). Under a non-public directive, their authority was extended to include "examin[ation] and evaluat[ion of] documentation concerned with contract administration actions which have been negotiated or otherwise completed and processed by an ACO."

On October 2, the Review Board requested supplemental data to answer questions on the price negotiations for this Order. *TI* I at 98,073 (Finding 12). On October 20, Hill wrote to TI and stated that the negotiations had been "subject to review by the DCASR Contract Management Board of Review" and that "[i]t appears that the agreed-to amount of $672,067.86 did not result in a fair and reasonable price." Hill requested that the negotiations be re-opened. *TI* I at 98,074 (Finding 16). TI objected to the re-opening by asserting that a final binding agreement had been reached.

## II

The ASBCA noted that "there is no SF30 executed by the ACO setting forth her acceptance of the negotiated price." The ASBCA held that the ACO's signature on the PNM was not "intended to manifest assent," because "[t]here is no conduct here on the part of the ACO that she had 'reason to know' would be understood by [TI] as manifesting agreement to the price negotiated by Mr. Jeppe." *TI* I at 98,077. The ASBCA stated:

All we have here is the ACO's act of signing the PNM. By itself, the signature could not connote the ACO's assent to the price negotiated on August 24, 1981.

*Id.*

In other words, because the ACO did not communicate her assent to TI, her signature approving the negotiated price was deemed an insufficient expression of assent to bind the Government. Furthermore, the ASBCA held that in view of the internal directive requiring the ACO to wait until the Review Board rendered its opinion, she could not legally have reached a final decision assenting to the negotiated price.

The ASBCA distinguished its prior decision in *Electrospace Corp.,* 72–1 BCA (CCH) ¶ 9,455, 1972 WL 1222 (ASBCA May 4, 1972), which it conceded was very similar in that an internal memorandum, signed by the ACO, recited approval of the negotiated price. The internal memorandum there was held to demonstrate approval by the ACO and that such approval was binding on the Government, *i.e.,* a contract had been formed according to the terms in the memorandum. In *Electrospace,* however, there had been testimony at the hearing by the ACO that the "signature indicated concurrence with the substance of the report and was intended as a decision to pay the appellant the amount negotiated." *TI* I at 98,077. This testimony was "evidence of an affirmative intent of the contracting officer, in approving the memorandum, to effect acceptance of the contractor's offer." *Id.* The ASBCA appeared to distinguish *Electrospace* by requiring testimonial corroboration of intent prior to finding that the ACO's signature demonstrated approval of the terms of a contract. Alternatively, we may read the ASBCA to mean that the ACO has not made a decision until the ACO actually communicates her assent to the contractor.

### III

TI contends that the ASBCA erred in holding that a contract was not formed upon negotiation of the price and its subsequent approval by the ACO. We thus consider whether the ACO's signature must be understood as establishing a prima facie case of approval of the negotiated price absent contrary evidence.

In *General Electric Co. v. United States,* 412 F.2d 1215, *reh'g denied,* 416 F.2d 1320, 189 Ct.Cl. 116 (1969), the Court of Claims addressed the significance of a Government official's signature on an internal document. In that case, the Army Weapons Command at the Rock Island Arsenal in Illinois issued a contract to General Electric Company ("GE") to design and test a weapons system. Supervision of the contract was delegated to the Boston Procurement District ("Boston"). GE submitted a claim to the Army Weapons Command for contract modification. The Army Weapons Command requested further information from Boston. The response stated that the "undersigned recommends that the Contracting Officer take such funding action." Among the signatures, as concurring with the letter's recommendations, was that of an authorized Contracting Officer, Colonel McDermott. This internal correspondence was not sent to GE. The Army Weapons Command denied reimbursement. The Court of Claims stated:

> Colonel McDermott was acquainted with the facts underlying the overrun dispute.... [I]t seems clear that, as a responsible Government official, he would have duly investigated the matter before indicating his concurrence, *as contracting officer,* in a recommended course of action. Failure to do so before signing in an official capacity would have been a neglect of duty. Unless evidence to the contrary is produced, the law presumes that official actions are properly taken.
>
> We disagree with the board's conclusion that Colonel McDermott used the definite language of recommendation merely as an executive notation that the letter had crossed his desk. To conclude, in the absence of direct evidence, that a contracting officer would so loosely use language embodying his authority conflicts with the mentioned presumption
>
> . . .
>
> ... Under the facts present here, we believe that when an authorized contracting officer expresses a definite opinion concerning the merits of a claim with knowledge of the relevant facts, a "decision" has been made.

*General Electric,* 412 F.2d at 1221 (emphasis original; citations omitted).

The body of law established by our predecessor courts has been adopted by this court. *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982). Under *General Electric,* the law presumes that when an ACO acquainted with the underlying facts signs an internal document, such as a PNM, that she has decided to express a definite opinion on the merits of the claim in the absence of contrary testimony or

evidence. Such contrary evidence or testimony is lacking here. A requirement for testimonial corroboration, such as that read into *Electrospace* by the ASBCA, is in error as a matter of law.

The Court of Claims also held in *General Electric* that the Government can be bound by a contracting officer's "unfettered opinion [as] the person delegated as decisionmaker by the parties to the contract," *id.*, even when that opinion is expressed in internal correspondence. In short, *General Electric* would require us to find a binding agreement if we were to find that the ACO's approval signature on the PNM was an expression of her final decision.

## IV

■ The issue before us is whether the ACO's approval of the PNM in this case was a final binding decision. First, we address whether the ACO had to execute an official document, *e.g.*, an SF–30, as an indication of a final binding decision. In a different context, this court has stated that "any bilateral modification of a contract is a 'supplemental agreement,' which requires the execution of a written standard form 30." *Mil–Spec Contractors v. United States*, 835 F.2d 865, 868 (Fed.Cir.1987). Of course, this particular agreement was not a "bilateral modification of a contract" but rather a fulfillment of an express contractual term that required both parties to negotiate firm fixed prices for unpriced line items. Second, the particular regulation relied upon in *Mil–Spec*, 48 C.F.R. § 43.301 (1986), was not in force at the time of the instant procurement dispute. The regulation then in force, 32 C.F.R. § 1–201.2 (1981), discussed in *SCM Corp. v. United States*, 595 F.2d 595, 597 (Ct.Cl.1979), defined a Contract Modification as:

> any written alteration in the specification, delivery point, rate of delivery, contract period, price, quantity, or other contract provisions of an existing contract, whether accomplished by unilateral action in accordance with a contract provision, or by mutual action of the parties to the contract. It includes (i) bilateral actions such as supplemental agreements,

and (ii) unilateral actions such as change orders, orders for provisioned items, administrative changes, notices of termination, and notices of the exercise of a contract option.

A "Supplemental Agreement" was defined in the regulations as "any contract *modification* which is accomplished by the mutual action of the parties." 32 C.F.R. § 1–201.18 (1981) (emphasis added). The Government contends that the price negotiation in this case was to terminate in a "supplemental agreement," or a "contract modification," and since contract modifications require the issuance of an SF–30, 32 C.F.R. § 16–103 (1981), an SF–30 must have been required.

The regulations governing *Mil–Spec* and *SCM* simply are inapplicable to the facts of this case. In both *Mil–Spec* and *SCM*, the alleged oral agreements were indeed supplemental since they would have altered or modified the existing contract. *SCM*, 595 F.2d at 597 ("agreement changing the price"); *Mil–Spec*, 835 F.2d at 867 ("oral agreement was a modification of the contract, since it increased the amount the government would pay"). In contrast, the negotiation between TI and the Government of a price term was not an "alteration in the specification, delivery point, rate of delivery, contract period, price, quantity or other contract provisions of an existing contract," since the "existing contract" was not in conflict with a newly negotiated price and, moreover, expressly contemplated the later negotiation of the price. Furthermore, *Mil–Spec* and the regulation merely restate the longstanding proposition that an integrated executory contract excludes modification except by a signed writing. *See* U.C.C. § 2–209(2). The law has long been that "[i]t makes no difference that the contract was not formally signed or the bond formally approved" for the Government to be bound by the terms of a contract. *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319, 39 S.Ct. 300, 301–02, 63 L.Ed. 620 (1918). "[F]ormal execution, as we have seen, [is] not essential to the consummation of contract." *Id.* The absence of an SF–30 therefore does not exclude the possibility that a final binding agreement was reached.

█ Second, we address whether the ACO here could not have issued a final binding decision because the Department of Defense had interposed an internally-required Review Board proceeding that precluded such a decision prior to consideration of its recommendations. Generally, "[w]hen the United States enters into contract relations, its rights and duties therein are governed by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1933). However, an agent of the Government may not bind the Government to an agreement when such an act is directly forbidden by U.S. law or regulations. *Federal Crop Ins. Co. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). In the situation at hand, Hill was not barred by any U.S. law or regulation from consummating an agreement on behalf of the United States with TI. The fact that the Defense Department has issued a non-public, internal directive that purports to add a limitation upon an ACO's authority to reach negotiated line item agreements, which limitation is not present in either statute or validly-issued regulation, cannot act to divest the ACO of the legal authority to make a decision that is final and conclusive. In other circumstances, the ASBCA has also held that non-public internal directives do not divest contracting officers of their authority to bind the government. *New England Tank Ind.,* 88–1 BCA (CCH) ¶ 20,395 (ASBCA Nov. 14, 1988), *vacated and remanded on other grounds,* 861 F.2d 685 (Fed.Cir.1988), *motion for modification denied,* 865 F.2d 243 (Fed.Cir.1989). *A–1 Garbage Disposal & Trash Serv.,* 89–1 BCA (CCH) ¶ 21,323 (ASBCA Oct. 31, 1988). We reach the legal conclusion that the ACO's signature on the PNM constituted an authorized decision to approve the negotiated price.

## V

█ We must now decide whether the facts as found by the ASBCA require the conclusion that a final binding agreement, a "meeting of the minds," was reached between the parties. We review the ASBCA's findings of fact for substantial evidence. *United States v. General Elec-*

*tric Corp.,* 727 F.2d 1567, 1572 (Fed.Cir. 1984) (citing 41 U.S.C. § 609(b)). Here, however, the ASBCA made no ruling on this particular issue since it believed that the ACO did not have the authority to make a final decision on the matter. As our predecessor court has stated:

> [W]here the evidence is undisputed but it is of such a nature that ... the [ASBCA] could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the [ASBCA] for determination of the factual issues; otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the [ASBCA] formally decide a fact which legally can be decided in only one way.

*Maxwell Dynamometer Co. v. United States,* 386 F.2d 855, 870, 181 Ct.Cl. 607 (1967).

█ Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances. We base our conclusion that a contract was formed upon uncontested facts and those facts specifically found by the ASBCA. The ASBCA found a signed writing by each party approving the agreed upon price of $672,067.86. We have held that the signatures must be given effect as a matter of law. The uncontested evidence establishes that the ACO's approval of the negotiated price was communicated to TI. TI expressed its approval of the negotiated price in the Certificate of Current Cost or Pricing Data. Furthermore, there had been a mutual expectation that negotiation would result expeditiously in a final decision as confirmed by the prior episodes of negotiation to final agreement, Jeppe's preparation of the PNM memorializing final agreement, the approval of the PNM by the ACO, the filing of a Certificate by TI stating the date of agreement as August 24, 1981, and the request by Jeppe, after approval of the PNM by Hill, of submission of a corrected Certificate. In short, the single term, price, is found in contemporaneous documents signed, indicating agreement thereto, and acknowledged by both parties to the contract.

Finally, we ask whether the discovery of new information could authorize the ACO to revoke a previously-established agreement. The reopening of negotiations based upon allegedly newly-discovered, unchecked, erroneous information, has been condemned by the ASBCA in *Kurz & Root Co.*, 74–1 BCA (CCH) ¶ 10,543, 1974 WL 1628 (March 18, 1974), where the ASBCA stated that an "agreement by the contracting officer and appellant is 'final and binding' on the Government and therefore not subject to revocation" when the revocation is based on unsupported and unverified allegations of impropriety not revealed to the contractor. Here, the allegations concerning the design of the equipment and the allocated costs of software development were unsupported. To paraphrase Justice Holmes, the Government as well must turn square corners in its contractual dealings. *Rock Island, Arkansas & Louisiana R. R. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). "[T]here must be some point at which discretion [to revoke an agreement] ceases and obligation takes its place." *Purcell Envelope*, 249 U.S. at 319, 39 S.Ct. at 302. We hold that a contract was formed on the negotiated price of $672,067.86 for Provisioned Item Order PK0005.

REVERSED.