**HENDERSON COUNTY DRAINAGE DISTRICT NO. 3, et al.,**
Plaintiffs,

v.

**The UNITED STATES, Defendant.**

No. 97–821 L.

United States Court of Federal Claims.

July 30, 2002.

Gary H. Baise, Washington, DC, for plaintiff. Eric P. Bock, Michael C. Formica, Washington, DC, of counsel.

Scott H. Park, with whom was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant, Lisa Donis, Civil Division, United States Department of Justice, Washington, DC, and Rian Hancks, United States Army Corps of Engineers, Office of Counsel, Rock Island District, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is a suit brought by drainage districts and riparian landowners along the Upper Mississippi River in Illinois and Missouri, where the United States Army Corps of Engineers (Corps) operates and maintains a 9–foot navigation channel (Navigation Project or 9–foot channel). Plaintiffs seek damages for alleged adverse impacts of the Navigation Project on their property on theories of breach of contract and takings. Before the court are the parties' cross-motions for summary judgment.[1] For the following reasons, Plaintiffs' Motion for Partial Summary Judgment is DENIED on the contract claims, and Defendant's Motion for Summary Judgment is GRANTED on the contract claims.[2]

## I. Background

The plaintiff drainage districts were created in 1913 under state authority in Illinois and Missouri, respectively, by farmer landowners along the Mississippi River.[3] Corrected Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgement (Pls.' Mem.) at 1. The two drainage districts have a statutorily imposed duty to protect the farmland within their borders by building, operating, and maintaining pumps, drainage districts, and drainage diversion channels to remove subsurface waters from those lands. Id. at 1; Corrected Second Amended Complaint (Second Am.Compl.) ¶ 5. The drainage districts also have a statutory obligation to serve their constituent farmers by constructing, operating, and maintaining riverside levees to protect farmlands from periodic flood events on the Mississippi River and its tributaries.[4] Pls.' Mem. at 1; Second Am.Compl. ¶ 5.

The plaintiff landowners are individual owners of farm land within the Henderson District. Second Am.Compl. ¶¶ 4–5, 7. The property interests of the plaintiff landowners are served and protected by the Henderson District. Id. at ¶ 5.

---

1. For purposes of streamlining discovery and briefing, the court directed the parties to identify the real parties in interest and to designate two lead drainage districts, one from Missouri and one from Illinois, to proceed as "test" plaintiffs. See Order dated April 20, 2000. The parties selected Henderson County Drainage District No. 3 (the Henderson District), Marion County Drainage District (the Marion District), and the riparian landowners as test plaintiffs. Second Am.Compl. ¶¶ 3, 7, 14. The landowners are John and Barbara Robb, Robert and Courtney Munson, Howard Pruett, and the Estate of Glen Romkey. Id. at ¶ 7. Discovery was limited to certain initial issues which are addressed in these cross-motions. When identifying the test plaintiffs and the threshold legal issues, see Transcript of September 18, 2000 Status Conference (Sept. 18, 2000 Tr.) at 67–71, plaintiffs acknowledged that, if unable to prevail on the initial issues, "[t]hen we've got nothing." Sept. 18, 2000 Tr. at 70.

2. Plaintiffs' breach of contract claim is set forth in the Second Amended Complaint ¶¶ 103–115 (Count I—drainage districts' breach of contract claim); ¶¶ 116–129 (Count II—landowners' breach of contract claim); ¶¶ 130–139 (Count III—drainage districts' reformation of contract claim); ¶¶ 140–151 (Count IV landowners' reformation of contract claim). See Second Am. Compl. ¶¶ 103–151. By separate order, the court is directing additional briefing on the takings claims.

3. Unless otherwise indicated, facts cited to the filing of only one party do not appear to be in dispute.

4. Levees are raised embankments intended to prevent a body of water from overflowing during temporary flood events. See Pls.' Mem. at 6 n. 24; The American Heritage Dictionary 1006 (4th ed.2000).

By the Rivers and Harbors Act of 1930, Congress authorized the construction of the Navigation Project, a 9–foot navigation channel on the Upper Mississippi River. Defendant's Memorandum in Support of Motion for Summary Judgment (Def.'s Mem.) at 1, 2. Constructed in the mid–1930s and placed into operation in 1937 and 1938, the 9–foot channel consists of locks and dams that divide the Mississippi River above St. Louis into a series of pools. *Id.* at 2. Commercial vessels use the Navigation Project to move cargo. Second Am.Compl. ¶ 25. To support commercial river traffic, the Corps maintains a minimum 9–foot channel depth along the length of the waterway using the dams to control pool levels.[5] Second Am.Compl. ¶ 26. The Henderson District is located in Illinois and borders the Mississippi River along Pool 18.[6] Def.'s Mem. at 2. The Marion District is located in Missouri and borders the Mississippi River along Pool 22.[7] *Id.*

The 9–foot channel is maintained and operated by the Corps. Second Am.Compl. ¶ 26. The Rock Island District of the Corps, located in Rock Island, Illinois has responsibility for the project from Pools 11 to 22. Def.'s Mem. at 2. The Corps maintains a continuous record of flows and hydrologic conditions in Pools 11 to 22, including data regarding inflows into Pool 11, inflows from tributaries feeding into the Mississippi, and rainfall. *Id.* at 2.

Beginning in the late 1930s and continuing into the 1950s, the United States made annual payments to fifteen drainage districts along pools created by the 9–foot channel. Second Am.Compl. ¶ 61; Def's Mem. at 3.

The payments were "for the additional pumping costs ... incurred [by the drainage districts] due to the higher water stages of the river created by the navigation project." Second Am.Compl. ¶ 61.

On March 18, 1955, the Secretary of the Army transmitted a report to Congress recommending rectification payments to each district. Def.'s Mem. at 3. In response, Congress authorized payments to the drainage districts with land affected by seep water and increased pumping costs, in exchange for releases waiving future claims arising out of the operation and maintenance of the 9–foot channel. *See* 33 U.S.C. §§ 610, 633 (2001). Based upon this statutory authority, the Corps forwarded releases to the various drainage districts for signature. Def.'s Mem. at 3. In 1961, both the Henderson District and the Marion District executed releases in exchange for rectification payments.[8] Def.'s Mem. at 3.

In 1995, plaintiffs filed this action.[9] Second Am.Compl. ¶ 1; Pls.' Mem. at 4. To resolve several threshold issues, the parties have filed cross-motions for summary judgment.

## II. Discussion

### A. Standard of Review

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. United States Court of Federal Claims Rule (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202

---

5. Under the "dam point control" method of operation, dam gates are opened when river flows increase to maintain a near constant water pool level at the dam. Defendant's Supplemental Appendix of Evidence in Support of its Response to Plaintiff's Motion for Partial Summary Judgment (Def.'s Supp.App.) at 69. Pool levels at the dams are maintained within a designated operating band (with upper and lower limits). *Id.* at 69–71.

6. The lock and dam at Pool 18 were placed in operation in 1937. Def.'s Mem. at 2.

7. The lock and dam at Pool 22 were placed in operation in 1938. Def.'s Mem. at 2.

8. The Henderson District signed a release providing for a payment of $43,929. Parties' Joint Appendix of Evidence in Support of Cross Motions for Summary Judgment (Jt.App.) at 860. The Marion District signed a similar release providing for a payment of $836. *Id.* at 862.

9. In April 1995, plaintiffs filed a petition in the Circuit Court for Henderson County, Illinois seeking an order authorizing depositions to perpetuate testimony. Pls.' Mem. at 4 n. 9. In May 1995, the United States removed the action to the United States District Court for the Central District of Illinois, Rock Island Division. *Id.* In February 1997, the district court transferred the case to this court. *Id.*

(1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The movant is entitled to summary judgment if the nonmovant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States*, 45 Fed. Cl. 450, 457 (1999).

## B. Standing of Plaintiff Landowners

The Commissioners of the Henderson County Drainage District and the Supervisors of the Marion County Drainage District, respectively, signed releases in 1961. *See* Jt.App. at 861, 863. The plaintiff landowners were not signatories. *See id.* at 861. Nonetheless, the plaintiff landowners argue that, "based upon their status as third party beneficiaries," *see* Pls.' Mem. at 39 (citing *Glass v. United States*, 258 F.3d 1349, 1352 (Fed.Cir. 2001)), they may assert the same claims as the plaintiff drainage districts.

The test for "determining third-party beneficiary status is whether or not the contract reflects the express or implied intention of the parties to benefit the party claiming third-party beneficiary status." *First Hartford Corp. v. United States*, 42 Fed.Cl. 599, 605 (1998), *rev'd in part on other grounds*, 194 F.3d 1279 (1999). The Federal Circuit instructs that "the intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed.Cir.1997). Such intent may be ascertained by "ask[ing] whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Id.*

Plaintiffs explain that the drainage districts exist for the sole purpose of benefitting their constituent landowners. Pls.'

Resp. at 17. Plaintiffs reason that, based on the purpose of the drainage districts to protect the farmland within their borders, any benefit to the drainage districts must be for the benefit of the landowners. *Id.* Plaintiffs observe that any financial impact on the drainage districts directly affects the amounts paid by the landowners in land assessments and drainage taxes. In response to an interrogatory from defendant, plaintiffs state that the "Congressional reports express the understanding of the United States that any damages to the landowners as a result of the maintenance of the nine-foot navigation channel would be remedied by way of payments to cover the increased operational costs of the Drainage Districts." Defendant's Appendix of Evidence in Support of Motion for Summary Judgment (Def.'s App.) at 36. Plaintiff landowners view the terms set forth in the Congressional reports as evidence of an intention to benefit them directly. *See* Pls.' Mem. at 35, 40.

Defendant contends that the language of the 1961 releases which authorized payment " 'in full settlement for all damages ... sustained by said district from the execution of the nine-foot channel project' " does not evidence an intention to benefit the individual landowners of the district. Def.'s Mem. at 36 (quoting Jt.App. at 860–61). Rather, defendant asserts, "Any benefit to the landowner plaintiffs would be in their capacity as taxpayers and the per acre assessment they paid to the District." *Id.* at 36–37. Although raised as an argument against standing, defendant's assertion appears to the court to concede plaintiffs' main point—that the landowners would reasonably expect to be helped (or injured) by the release.

The court finds that the plaintiff landowners "would be reasonable in relying on the promise" to the drainage districts, if any, made in the releases and are therefore third party beneficiaries of any contractual undertakings by defendant in the releases. *See Montana v. United States*, 124 F.3d at 1273. As third party beneficiaries, the plaintiff landowners have standing to maintain their claims.

### C. The Parties' Assertions

Plaintiffs allege that the releases are contracts which contain promises about the operation and maintenance of the Navigation Project. Second Am.Compl. ¶¶ 104–108, 117–122. Plaintiffs also allege that policy changes by the Corps with respect to the operation and maintenance of the 9–foot channel since the execution of the releases in 1961 have breached contractual terms of the releases. Pls.' Mem. at 4. *See also* Second Am.Compl. ¶¶ 108, 122. Plaintiff landowners, in particular, allege that, as the intended third party beneficiaries of the releases, they have either suffered breach of contract damages or, alternatively, are owed just compensation for the taking of their private property for public use. *See* Second Am.Compl. ¶¶ 7, 118, 128, 196, 214.

Defendant asserts that plaintiffs' contract claim is barred by the same 1961 releases on which plaintiffs rely. Def.'s Mem. at 5. Defendant further asserts that the releases do not impose contractual obligations on the Corps and, in the absence of a contract imposing duties on the Corps, plaintiffs cannot maintain a breach of contract claim. *Id.* Defendant adds that, even if plaintiffs were able to establish the existence of a contract, the contract claim is time-barred. *Id.* at 4.

### D. The Terms of the Releases

The 1961 releases executed by the plaintiff drainage districts are two-page documents. *See* Jt.App. at 860–61, 862–63. The language of the releases for the Henderson District and for the Marion District is substantially identical. *Id.* The releases state:

WHEREAS, The Congress of the United States, by an Act approved July 3, 1958 ... has authorized the rectification of damages to certain levee and drainage districts caused by the execution of a project on the Mississippi River ... to provide a navigation channel nine feet deep and of adequate width for navigation by the construction of twenty-six locks and dams of low heads supplemented by channel dredging (hereinafter referred to as "the nine-foot channel project"), and

WHEREAS, The Act approved July 3, 1958 provides that said rectification of damages shall be undertaken in accordance with the plans and subject to the conditions in House Document Numbered 135, Eighty-fourth Congress, First Session, and

WHEREAS, the said House Document Numbered 135 provides that a payment of [sum certain] may be made to [the particular drainage district] in full settlement for all damages heretofore or hereafter sustained by said district from the execution of the nine-foot channel project, upon presentation of such evidence, certificates, receipts, releases, and assurances as the Chief of Engineers may consider reasonable and necessary, and

WHEREAS, The Congress has appropriated Federal funds for said payment;

NOW THEREFORE, in consideration of the sum [certain] in hand paid by the United States, receipt of which is hereby acknowledged, [the particular drainage district] does hereby release and forever discharge the United States ... from any and all damages and claims for damages, past, present, and future, that said district may have or claim to have, arising out of, resulting from, or caused by the execution, construction, operation, or maintenance of the nine-foot channel project except for the final annual payment for increased pumping costs for the calendar year 1960.

IN WITNESS WHEREOF, we, the Commissioners of [the particular drainage district] have hereunto subscribed our names for and on behalf of said district this ... day of ... 1961.

Jt.App. at 860–863 (citations omitted).

### E. Interpretation of the Releases

Plaintiffs allege that the releases executed by the drainage districts are contracts that imposed certain duties upon the Corps. *See* Pls.' Mem. at 11; *see also* Second Am.Compl. ¶ 106. Plaintiffs reason that the "whereas clause" in the releases incorporates by reference both the 1958 River and Harbors Act and the 1955 Report (also referred to as House Document 135). Pls.' Mem. at 35. Plaintiffs explain that, because the 1955 Report is the document which prescribes how the "rectification of damages" contemplated

by the releases is to occur, the reference in the releases to the 1955 Report evidences an intention by the parties to incorporate by reference the terms of the 1955 Report and the 1958 River and Harbor Act in the releases. Pls.' Mem. at 35–36.

Plaintiffs assert that the Corps was required by Congress to protect plaintiffs' levees, specifically:

> to undertake, as part of its maintenance of the Navigation Project, protective works and maintenance of those levees that form an essential part of the project[;] ... to maintain the navigation pool at specified levels; [to] take remedial action regarding siltation at drainage outlets attributable to the Navigation Project; [to] operate the dam to maintain river stages in the pools at levels used in the seepage calculation on which damage payments were based; and [to] maintain the 9–foot channel depth through direct supplemental dredging.

Pls.' Mem. at 11.

Defendant contends that if the releases are contracts, they imposed a bare duty on the government to pay a specified damages payment in exchange for a waiver of future claims. Def.'s Mem. at 28. Defendant states that "there is nothing in the releases articulating a duty or obligation on the part of the Corps, inuring to the benefit of the districts, to maintain the navigation channel pursuant to certain standards." *Id.* at 27–28. Defendant argues that while "House Document 135 articulates the basis for the damages computations to be paid to each district[,] ... that document in no way obligates the Corps to maintain the 9 foot channel within set parameters." *Id.* at 28.

■ Interpretation of a release is a matter of law. *Kenbridge Constr. Co. v. United States,* 28 Fed.Cl. 762, 765 (1993) (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984)). A release is interpreted according to well-settled principles of contract law, and the starting point is the plain language of the contract. *See George Hyman Constr. Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir. 1987). In resolving a dispute of interpretation, the focus of the court is ascertaining the intent of the parties. *Alvin Ltd. v. United*

*States Postal Serv.,* 816 F.2d 1562, 1565 (Fed. Cir.1987).

Contracts with the United States may be express or implied. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir. 1997). This court possesses jurisdiction over both types of contracts. *See* 28 U.S.C. 1491(a)(1) (2002). A party alleging a contract must demonstrate "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997).

While the releases here are not signed by the United States, the absence of a government official's signature is not controlling. *See Texas Instruments Inc. v. United States,* 922 F.2d 810, 814 (Fed.Cir.1990) (citing *United States v. Purcell Envelope Co.,* 249 U.S. 313, 319, 39 S.Ct. 300, 63 L.Ed. 620 (1919)) (noting that the government may be bound to the terms of a contract even if the contract was not formally signed). It is, however, the plaintiff's burden to establish that the government agent who allegedly bound the United States "had the requisite contracting authority" to do so. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990).

■ As the text quoted above indicates, most of the language in the releases is in the recitals, the "whereas" clauses. The law provides that, "[a]lthough 'whereas' clauses generally are not considered 'contractual' and cannot be permitted to control the express provisions of the contract, recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties." *KMS Fusion, Inc. v. United States,* 36 Fed.Cl. 68, 77 (1996) (citing cases).

Plaintiffs read the releases to require that the Corps "maintai[n] the navigation projects ... [at a] minimum channel depth of nine feet." Second Am.Compl. ¶ 26. Plaintiffs contend that the releases contemplate, at a minimum, "the continued dredging of the channel to maintain the nine foot depth[ ] and

do[ ] not authorize [the] manipulation of dam operations and pool elevations" to achieve the mandated depth if dredging is curtailed. Pls.' Resp. at 13. At the same time, plaintiffs acknowledge that the releases discharge the United States from liability in connection with " 'the execution, construction, operation, or maintenance of the nine foot channel project.' " *Id.*

In evaluating the evidence regarding the parties' intentions in executing the releases, the court turns first to the text of the releases. *See George Hyman Constr. Co.,* 832 F.2d at 579. The releases state that House Document 135 authorizes the payment of a specific amount to the respective drainage districts "in full settlement for all damages heretofore or hereafter sustained by said district from the execution of the nine-foot channel project." Jt.App. at 860, 862. The language of the releases and the evidence adduced by the parties (including the plaintiffs' admissions, the deposition testimony of Mr. Crane on behalf of the Corps, and the deposition testimony of Mr. Fort on behalf of the drainage districts) indicate that the parties intended the drainage districts to receive a sum certain for all damages caused by the Navigation Project. From the face of the document, uncontradicted by witness testimony, the parties' mutual intent to contract was limited to the payment of a specific amount for damages, in exchange for a full release.

Notwithstanding plaintiffs' argument that the Corps undertook maintenance responsibilities under the releases with respect to the Navigation Project, the express language in the releases requires that "in consideration of" the sum certain paid by the United States to the respective drainage districts, the drainage districts "release and forever discharge the United States ... from any and all damages and claims for damages, past, present, and future, ... arising out of, resulting from, or caused by the execution, construction, operation, or maintenance of the nine-foot channel project except for the final annual payment for increased pumping costs for the calendar year 1960." Jt.App. at 860–

61, 862–63. In the court's view, the terms of the releases support the narrow interpretation of the Corps' duty to make a payment urged by defendant.

Defendant also argues that "the record is devoid of any evidence that the releases were prepared by a federal official with either the intent or authority[10] to bind the United States to a contract obligating it to adhere to specific channel maintenance obligations." Defendant's Supplemental Brief Pursuant to the March 6, 2002 Order (Def.'s Supp.Br.) at 3. Defendant points to the deposition testimony of Thomas F. Crane, former District Counsel for the Rock Island District of the Corps who drafted the releases at issue in this case. Mr. Crane testified that the only obligation of the United States under the signed releases was "to pay the specifically-stated rectification amounts." *See id.* at 1; Def.'s Supp.App. at 6, 7. Mr. Crane explains that the "whereas" clauses were not intended to impose any contractual duties upon the United States, but "merely state the origin of, and authority for, the release." Def.'s Supp.App. at 7.

In further support of its view of the intent of the releases, defendant points to the deposition testimony of Lyman Fort, the attorney representing Henderson District in 1961 in connection with the execution of its release. Def.'s Supp.Br. at 4. Mr. Fort stated in his deposition that, in accordance with Illinois law, he drafted an order for the County Court for Henderson County to approve the execution of the 1961 release by the drainage district commissioners. Def.'s App. at 213, 219–20. Explaining that he tried to track the language of the releases in preparing the court order, Mr. Fort testified that the order "was ... [not] intended to do anything other than authorize the commissioners to sign the release and [accept] the money." *Id.* at 220.

Defendant also points to a letter dated December 22, 1960 from Mr. Fort, the attorney for the Henderson District, to his client stating:

I have talked with the legal advisers for the U.S. Army Engineer Corps. They ad-

---

10. While the intent of the releases was strongly contested, plaintiffs do not address the issue of the contracting authority of the Corps official who promulgated the releases. Plaintiffs, of course, have the burden of showing contracting authority, *City of El Centro,* 922 F.2d at 820.

vise me that the releases which they gave to the District for execution are determined by the Statute which provided for the payment of the capitalized settlement and that they can in no way alter the release. They further advise me that they have no ownership or responsibility in regard to the river levy [sic]. However, they do advise me that as a matter of practice they usually assist the Districts in the event of a levy [sic] break through emergency flood control appropriations. The only thing I can do is to recommend that the Commissioners sign the releases and send them to the Corps of Engineers.

Jt.App. at 865A; *see also* Oral Arg.Tr. at 41. The record also includes a series of letters from the Corps sent in the late 1960s and during the 1970s to either Lyman Fort (in 1967, 1978), attorney for the Henderson District, or Howard Pruett (in 1972, 1974, 1978), one of the Henderson District commissioners, disclaiming any responsibility for maintenance of the districts' levees. Jt.App. at 873–74, 878, 880–881, 884–885, 889–890; *see also* Oral Arg.Tr. at 42.

The evidence in this case does not support a finding that the releases either stated or incorporated any contractual responsibility by the Corps for maintenance of plaintiffs' levees or that the plaintiffs were in any way led to believe that they did so.

Moreover, the court finds plaintiffs' alternative arguments regarding the validity of the executed releases unavailing. Plaintiffs assert that the releases are void *ab initio* because the Corps was "under a preexisting duty to compensate landowners for damages resulting from seepage and backwater effects of the Corps' operation of the nine foot channel for navigation purposes." Pls.' Mem. at 32. Citing Section 73 of the *Restatement (Second) of Contracts* (1979), plaintiffs argue that the performance of a legal duty (or preexisting duty) is not valid consideration for a contract. Pls.' Mem. at 32. The Corps' preexisting duty to make annual payments to the drainage districts for damages, however, began in 1936 and stopped in 1951. *See* Jt.App. at 132, 136. When the releases were executed in 1961, ten years had elapsed since the Corps had made an annual payment to the drainage districts. Any claim plaintiffs may have had pertaining to the Corps' alleged preexisting duty (or alleged breach thereof) accrued no later than 1952 and was time-barred by the six-year statute of limitations when plaintiffs executed the subject releases. *See* 28 U.S.C. § 2501 (1994). Because the Corps was under no preexisting duty to make annual payments to the drainage districts when the parties executed the 1961 releases, plaintiffs' argument that there was no valid consideration for the releases must fail.

■ Plaintiffs also assert that the releases are void because plaintiffs were "placed under duress by the economic realities of the situation." Pls.' Mem. at 33. The Federal Circuit requires that duress be proved by three elements: (1) the complainant's involuntary acceptance of the terms offered by the United States; (2) no other alternative under the circumstances; and (3) circumstances resulting from coercion by the government. *Dureiko v. United States,* 209 F.3d 1345, 1358 (Fed.Cir.2000). Plaintiff "must show that government coercion was the cause of the ... financial distress...." *Vicari v. United States,* 47 Fed.Cl. 353, 360 (2000) (citing cases). Economic conditions and financial concerns alone are not enough. *See Adler Constr. v. United States,* 191 Ct.Cl. 607, 423 F.2d 1362, 1364–65 (1970).

■ The evidence in this case does not support a finding of duress. Plaintiffs executed the releases after consulting with their respective attorneys. Documentary evidence contemporaneous with the execution of the releases indicates counsel for the drainage districts made specific inquiries to the Corps about the documents prior to advising their clients to sign. *See* Jt.App. at 865 (letter dated December 8, 1960 from Lyman Fort, attorney for the Henderson District, to the Corps seeking rewording of the release to avoid releasing the government from responsibility for maintaining the river levee); Jt. App. at 869 (letter dated June 21, 1961 from Myrl Sternke, attorney for the Marion District, to the Corps challenging the Corps' methodology in calculating seepage rates). Although plaintiffs expressed some dissatisfaction with the terms of the releases and the

amount of money damages, *see* Jt.App. at 865, 865A, 869, plaintiffs have not alleged facts concerning the circumstances surrounding the Corps' preparation of the releases and the plaintiffs' decision to execute the documents that could as a matter of law show a level of government coercion necessary to establish duress.

Plaintiffs argue that the Corps' failure to operate and maintain the navigation project "within very specific parameters" was a material failure to perform. Pls.' Mem. at 37; Pls.' Resp. at 15–16. Plaintiffs add that a material failure to perform permits the court to void the releases and thereby relieve plaintiffs of the contractual prohibition against suit. Pls.' Mem. at 39. Under the law, when a breach of contract arises from a "material failure of performance by one party ... so that a condition precedent to the other party's performance has not occurred," the non-breaching party may elect to cease performance under the contract. *First Heights Bank, FSB v. United States*, 51 Fed.Cl. 659, 663 (2001) (citing 14 *Williston on Contracts* § 43:15 (4th ed.2000)). The court, however, has found no contractual breach in this case because the court determined that the government's obligation under the releases was limited to the payment of money damages to the drainage districts. In exchange for such payment, plaintiffs waived all prior or subsequent liability on the part of the government in connection with the operation or maintenance of the 9-foot channel navigation project. Because it is the court's view that the releases did not require defendant to perform the maintenance obligations alleged by plaintiffs, plaintiffs' "material failure to perform" argument must fail.

 Alternatively, plaintiffs seek reformation of the contract for an alleged mutual mistake. *See* Pls.' Resp. at 16; Pls.' Reply at 13. Plaintiffs complain that the methodology used by the Corps to calculate seepage rates was flawed and therefore yielded inadequate damage payments for the pumping costs associated with future seepage. Second Am.Compl. ¶¶ 132–139, 142–151; Pls.' Resp. at 16; and Pls.' Reply at 13. Plaintiffs specifically allege that "[t]he Drainage Districts have experienced and continue to experience seepage rates as much as 8 times the seepage rates estimated by the Corps and reported to Congress." Second Am.Compl. ¶¶ 135, 146. While a court may grant relief for mutual mistake when the parties agreed upon the terms of the agreement but a defective writing does not conform to the existing understanding, *see Emerald Maint., Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir. 1991), reformation is not appropriate for an "erroneous prediction or judgment as to future events...." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1203 (Fed.Cir. 1994). It appears to the court that plaintiffs' complaint regarding the Corps' erroneous seepage estimate, *see* Second Am.Compl. ¶¶ 137, 148, is simply plaintiffs' dissatisfaction with the Corps's "erroneous ... judgment" with respect to the estimated seepage damage. Plaintiffs are not entitled to the contract reformation sought in Counts III and IV of the Second Amended Complaint.

### F. A Claim Under the Releases is Time-Barred

Even if plaintiffs' Second Amended Complaint could be interpreted to state a breach of contract claim, plaintiffs are precluded by the statute of limitations from pursuing that contract claim. Plaintiffs in this action executed the releases in 1961, *see* Jt.App. at 860–863, but did not file suit until 1995. *See* Second Am.Compl. ¶¶ 1.

The applicable statute of limitations for filing suit in the Court of Federal Claims is six years. 28 U.S.C. § 2501 (1994). The statute provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." *Id.* The six-year limitations period for actions against the United States "is a jurisdictional requirement attached by Congress" that must be strictly construed. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed.Cir.1988); *see also Franconia Assocs. v. United States*, 240 F.3d 1358, 1362 (Fed.Cir. 2001) (*quoting Hart v. United States*, 910 F.2d 815, 817 (Fed.Cir.1990)) (The six-year limitation is " 'an express limitation on the Tucker Act's waiver of sovereign immunity.' "); *Seldovia Native Ass'n v. United*

*States*, 144 F.3d 769, 774 (Fed.Cir.1998) (stating that "statute of limitations issues ... are jurisdictional").

Determining whether plaintiffs' takings claim is time-barred requires the court to ascertain when the cause of action first accrued. The Federal Circuit has held that a claim against the United States first accrues "when all the events have occurred which fix the alleged liability of the defendant," *see Hopland Band*, 855 F.2d at 1577, at which time "the plaintiff has a legal right to maintain his or her action." *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed.Cir.1993) (quoting Calvin W. Corman, *Limitation of Actions*, § 6.1 (1991)). The only obligation of the government in this case was to pay money, and plaintiffs have not claimed a breach of that obligation. Because any such breach would have been known at or close to the date of the contract, plaintiffs' claim is time-barred.

III. Conclusion

For the foregoing reasons, plaintiffs' motion for partial summary judgment is DENIED with respect to their contract claims. Defendant's motion is GRANTED with respect to the contract claims contained in Counts I, II, III, and IV of plaintiff's Corrected Second Amended Complaint.

IT IS SO ORDERED.