**Walter JAYNES, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 04–856C.**

United States Court of Federal Claims.

Dec. 7, 2005.

748

Ronald A. Schmidt, Garvey Schubert Barer, Washington, D.C., for plaintiff. Donald B. Scaramastra, Garvey Schubert Barer, Seattle, Washington, and David J. Shaffer, Washington, D.C., of counsel.

Thomas B. Fatouros, Trial Attorney, Mark A. Melnick, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. John D. Noel, Senior Trial Attorney, Daniel E. O'Connell, Jr., Senior Litigation Counsel, and Kathleen A. O'Neill, Senior Trial Attorney, Department of the Navy, Washington, D.C., and Steven L. Seaton, Puget Sound Naval Shipyard, Bremerton, Washington, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

Plaintiffs, five employees of the Puget Sound Naval Shipyard located in Bremerton, Washington, filed this action on June 15, 2004, alleging that defendant, the United States, failed to pay Environmental Differential Pay for "high work" as mandated by federal laws, regulations, and a collective bargaining agreement.[1]

Plaintiffs filed an amended complaint on July 14, 2004, dividing their claims into three separate counts.[2] On August 13, 2004, the Government filed an answer to plaintiffs' amended complaint. On November 5, 2004, plaintiffs filed a motion for partial summary judgment on Count One of the amended complaint. Count One alleges that defendant unlawfully failed to pay plaintiffs for high work performed between April 13, 1993 and March 23, 1999 and that plaintiffs are entitled to an award of back pay for that period under the Back Pay Act, 5 U.S.C. § 5596 (2000). Am. Compl. ¶ 53–58. Defendant filed a cross-motion for summary judgment and opposition to plaintiffs' motion for partial summary judgment on June 3, 2005. Plaintiffs filed a reply in support of their motion for partial summary judgment and an opposition to defendant's cross-motion for summary judgment on July 6, 2005. Defendant filed a

1. Plaintiffs filed a motion for class certification contemporaneously with the original complaint, which the Court denied on August 19, 2005. Plaintiffs filed a motion for reconsideration of the denial of class certification on September 2, 2005 that is currently pending. Pursuant to the Court's request, defendant filed an opposition on

October 19, 2005. Plaintiffs filed a reply on November 9, 2005.

2. For a description of the counts, see the "Background" section, *infra* at 6.

reply in support of its cross-motion on August 1, 2005.

For the reasons set forth below, the Court DENIES plaintiffs' motion for partial summary judgment, and the Court DENIES defendant's cross-motion for summary judgment.

### BACKGROUND

The plaintiffs in this case are employees of the Puget Sound Naval Shipyard ("PSNS") located in Bremerton, Washington. The employees brought an action to recover money damages against the United States for failing to pay Environmental Differential Pay for high work ("high pay") as mandated by Article 10 and Appendix II of the Bremerton Metal Trades Council ("BMTC") Agreement (the collective bargaining agreement ("CBA") between the BMTC and PSNS), as well as by Office of Personnel Management ("OPM") regulations, 5 C.F.R. § 532.511 (2005) and 5 C.F.R. part 532, subpart E, appendix A (2005). (5 C.F.R. part 532, subpart E, appendix A is hereinafter referred to as "OPM Regulatory Appendix A" or "OPM Reg.App. A.")[3]

Plaintiffs were employed and classified as shipwrights or were otherwise doing the work of shipwrights at PSNS. All shipwrights are assigned to Shop 64 at PSNS. Shop 64 also includes insulators and woodworkers. The Shop 64 insulators and woodworkers, as well as employees from other shops ("loan-overs"), are sometimes assigned to do the work of shipwrights in Shop 64. The primary duties of shipwrights involve the erecting and dismantling of staging or scaffolding in and around naval ships in dry dock. The plaintiffs contend that shipwrights regularly work under conditions and circumstances that would qualify as high work under Appendix II of the BMTC Agreement and OPM Regulatory Appendix A.

Federal statute and regulations mandate that federal civilian workers, whose positions are covered by the Federal Wage System ("FWS") and who are paid on an hourly basis in accordance with a local prevailing-rate pay schedule, receive additional compensation, known as Environmental Differential Pay, when exposed to working conditions or hazards that fall within one of the categories determined by OPM. 5 U.S.C. § 5343(c)(4) (2000); 5 C.F.R. § 532.511; *see generally* Prevailing Rate Systems Act, 5 U.S.C. §§ 5341–5349; 5 C.F.R. §§ 532.101–532.801 (2005). One such category is high work, which is defined by OPM Regulatory Appendix A, part I.2 and by Appendix II of the BTMC Agreement to include:

a. Working on any structure of at least 30 meters (100 feet) above the ground, deck, floor or roof, or from the bottom of a tank or pit;

b. Working at a lesser height:

(1) If the footing is unsure or the structure is unstable; or

(2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); or

(3) If adverse conditions such as darkness, steady rain, high wind, icing, lightning or similar environmental factors render working at such height(s) hazardous.[4]

The Back Pay Act provides, in relevant part:

An employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or

---

**3.** The relevant regulatory provisions defining high work have remained substantially unchanged since April 13, 1993, the earliest date of entitlement alleged in Count One of the amended complaint.

**4.** Work performed at or above 30 meters (100 feet) is not at issue in this case because PSNS management has always recognized its duty to pay a high work differential for work at such heights.

part of the pay, allowances, or differentials of the employee—

(A) is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect—

(i) an amount equal to all or any part of the pay, allowances, or differentials, as applicable which the employee normally would have earned or received during the period if the personnel action had not occurred, less any amounts earned by the employee through other employment during that period....

5 U.S.C. § 5596(b)(1) (2000). The Act also provides that back pay is payable with interest. § 5596(b)(2). "[I]n no case may pay, allowances, or differentials be granted under this section for a period beginning more than 6 years before the date of the filing of a timely appeal or, absent such filing, the date of the administrative determination." § 5596(b)(4).

Shipwrights at PSNS are represented by a union called the Bremerton Metal Trades Council, Local Union 2317 ("BMTC"). However, not all shipwrights are members of the BMTC union. On April 13, 1999, the BMTC union filed a grievance on behalf of 99 employees, including the five plaintiffs, demanding Environmental Differential Pay for high work. On January 18, 2000, Mary Jane Tallman, superintendent for the shipwrights, and Joe Aiken, the BMTC union representative, signed the "Employee Grievance Decision, Shipwright Highpay Grievance # 05153–K" ("Grievance Decision"). In the Grievance Decision, Ms. Tallman found that "[c]ertain work situations encountered by Shipwrights in erecting and dismantling staging do meet the criteria for 25% high pay in accordance with Article 10 and Appendix II of the BMTC Agreement and the Schedule of Environmental Differentials at 5 CFR 532, Subpart E, Appendix E [sic]." Def's Cross–Mot. Summ. J. and Opp. Pls.' Mot. Partial Summ. J. ("Def's Cross–Mot."), App. at 21. The decision established that the in the future shipwrights will receive high pay when they are: (1) building and dismantling staging beginning from the first level above the

ground/deck unless flooring and safety rails are installed or fall protection devices can be properly used; and (2) building and dismantling hanging staging working from similar heights under similarly unguarded situations when fall protection devices cannot be properly used. *Id.* The new prospective policy appears to be less generous to employees than the requirements of the relevant federal regulations (and, by incorporation, the BMTC Agreement), which requires high pay at heights below 100 feet: "(1) [i]f the footing is unsure or the structure is unstable; *or* (2)[i]f safe scaffolding, enclosed ladders or other similar protective facilities are not adequate." OPM Reg.App. A, pt. I.2(b) (emphasis added). The decision limited the award of high pay to the period beginning 15 working days prior to the filing on April 13, 1999 of the grievance (March 23, 1999) and ending on the date of the Grievance Decision (January 18, 2000). Def.'s Cross–Mot. at 4. According to Mark Winkler, the PSNS negotiator, management so limited the back pay award because the BMTC Agreement provided that a grievance must be filed within 15 working days of the event giving rise to it or from the time the grievant knew or should have known that he had been aggrieved. *Id.*, App. at 5. Defendant states that it paid a total of $374,407.06 in back pay to the 99 grievants plus 35 other employees pursuant to the Grievance Decision. *Id.* at 30, App. at 12. The union elected not to proceed to binding arbitration.

The BMTC Agreement became effective on October 1, 1987. Article 30 of the BMTC Agreement sets forth the procedures for resolving employee and union grievances. Article 30, section 3001(a) of the Agreement provides:

For the purpose of this Article the written [BMTC] Agreement is defined as Article 01 through 39, and any Appendices and Addendums thereto. Except as provided for in the [Civil Service Reform] Act, the procedures specified in this Article are the exclusive procedures available to employees, the Employer and the Council for resolving grievances which fall within its coverage.

Def's. Cross–Mot., App. at 46. The Agreement's definition of a grievance includes any complaint by an employee, the Council, or PSNS concerning "[t]he effect or interpretation, or a claim of breach of this collective bargaining agreement" or "[a]ny claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* PSNS and BMTC entered into a new agreement containing the same language effective June 13, 2003, several years after the events at issue in this case. *See id.,* App. at 51–52.

On April 14, 2000, fifty-six individual plaintiffs filed a complaint in the United States District Court for the Western District of Washington seeking review of the grievance decision's 15–working–day limit on the back pay awarded for high work allegedly performed prior to the filing of the grievance and a grant of class-wide [5] relief declaring an entitlement to six years' back pay with interest. *Jaynes v. Danzig,* No. C00–5221RJB (W.D. Wash. dismissed May 29, 2001), *aff'd,* 65 Fed.Appx. 176 (9th Cir.2003). The district court denied class certification on December 6, 2000. *See* Order Den. Pls.' Mot. to Certify Matter as Class Action, *Jaynes v. Danzig,* No. C00–5221RJB (W.D.Wash. Dec. 6, 2000). In March 2001, the Navy moved for dismissal for lack of subject-matter jurisdiction. The district court granted that motion. On July 9, 2001, plaintiffs appealed to the Ninth Circuit, seeking review of the district court's orders denying class certification and dismissing the case on jurisdictional grounds. On May 22, 2003, the Ninth Circuit affirmed the district court's dismissal for lack of jurisdiction and remanded the case to the district court with instructions to transfer the case to the Court of Federal Claims. *See Jaynes v. Johnson,* 65 Fed.Appx. 176 (9th Cir.2003).[6] Having affirmed the district court's decision to dismiss the case for lack of jurisdiction, the Ninth Circuit declined to review the order denying plaintiffs' motion for class certification. *Id.* at 180. The case was transferred to this court on May 18, 2004 pursuant to 28 U.S.C. § 1631 (2000).[7] Upon transfer of the complaint to this court, 51 plaintiffs dropped out of the case.

Plaintiffs seek "back pay retroactive to six years prior to the date of the grievance less the 15 days back pay awarded by PSNS management." Am. Compl. ¶ 58. It appears, therefore, that the period of alleged entitlement runs from April 13, 1993 until March 23, 1999 (the latter date being 15 working days prior to April 13, 1999, the date the grievance was filed).[8] Plaintiffs base their claim on: 1) the Government's failure to

---

5. In the district court, plaintiffs requested certification of a class "generally to be composed of all Shipwrights and others authorized to receive High Pay while assigned as Shipwrights, including retired Shipwrights and those who have terminated employee status as Shipwrights while eligible for High Pay." Compl. ¶ 9, *Jaynes. v. Danzig,* No. C00–5221RJB (W.D.Wash. Apr. 14, 2000).

6. The Ninth Circuit held that the district court lacked jurisdiction over plaintiffs' back pay claims because, among other things, the Back Pay Act was not an independent basis for district court jurisdiction, plaintiffs could not meet the requirements for mandamus jurisdiction under 28 U.S.C. § 1361, and plaintiffs could not establish jurisdiction under the Administrative Procedure Act because an adequate remedy was available in this court in the form of an action under the Back Pay Act based upon jurisdiction conferred by the Tucker Act. *See Jaynes,* 65 Fed. Appx. at 178–79.

7. Although the district court transferred the case on May 18, 2004, plaintiffs did not file their original complaint in this court until June 15, 2004 because Rule 3.1(a)(2) of the Rules of the Court of Federal Claims ("RCFC") allows plaintiffs 28 days after the filing in this court of the district court record and the district court's order granting transfer within which to file a complaint in this court.

8. Although the amended complaint alleges entitlement to high pay from April 13, 1993 until March 23, 1999, plaintiffs modified their class definition in this court to include "[a]ll persons who were assigned as shipwrights of Puget Sound Naval Shipyard from April 14, 1994 to the present" in part because "the controlling date for the purposes of the six year statute of limitations is April 14, 2000, the date of the filing of Plaintiffs' original class action in the [district court]." Pls.' Supplemental Br. in Support of Class Certification at 2 (docket entry 31, Jan. 7, 2005). Plaintiffs tendered the current version of the definition of the putative class during a November 22, 2004 status conference as part of a "Proposed Notice of Class Certification." *See Jaynes v. United States,* No. 04–856C, slip op. at 2 (Fed. Cl. Aug. 19, 2005) (docket entry 61, Opinion and Order denying class certification).

pay back pay for high work as defined in OPM Regulatory Appendix A, part I.2(b)(1) and (b)(2) "in violation of" the Back Pay Act, 5 U.S.C. § 5596, see Am. Compl., Count One; and 2) the Government's failure to pay for high work performed during adverse conditions in violation of Appendix II of the BMTC Agreement and OPM Regulatory Appendix A, part I.2(b)(3), see Am. Compl., Count Two. The amended complaint appears to assert the Back Pay Act claim based on failure to pay for high work as defined by (b)(1) and (b)(2) (Count One) as separate from the adverse conditions claim (Count Two), although both claims appear to seek back pay. Plaintiffs also seek a declaratory judgment and injunctive relief requiring PSNS management to provide high pay as required by law, regulation, and the BMTC Agreement. See Am. Compl., Count Three.[9]

As mentioned above, plaintiffs seek summary judgment as to liability on their back pay claims under Count One. Defendant opposes plaintiffs' motion for summary judgment on the ground that material issues of fact exist regarding plaintiffs' entitlement to high pay. Defendant has filed a cross-motion for summary judgment on the grounds that BMTC has waived plaintiffs' claims and that the claims are barred by the doctrine of accord and satisfaction. The Court first discusses defendant's cross-motion (Section II, infra) because defendant's argument that BMTC waived plaintiffs' right to seek a judicial remedy would, if successful, be dispositive (Section II. A., B. and C., infra). In addition, the existence of genuine issues of material fact concerning the defense of accord and satisfaction would preclude summary judgment for both parties (Sections II. D. and III. A., infra). The Court then considers plaintiffs' motion for partial summary judgment insofar as it relates to plaintiffs' entitlement to high pay (Section III. B., infra).

## DISCUSSION

### I. Standard for Decision

The court may grant summary judgment if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might affect the outcome of the suit. Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505. An interlocutory summary judgment may be rendered on liability alone although there is a genuine issue concerning the amount of damages. RCFC 56(c).

"The moving party bears the burden of demonstrating the absence of a genuine question of material fact." O'Connor v. United States, 308 F.3d 1233, 1240 (Fed.Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The court must view the evidence in the light most favorable to the nonmovant and resolve all doubts in the nonmovant's favor. Id. (citing Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505). Once the movant has met its burden, the nonmovant must "proffer countering evidence sufficient to create a genuine factual dispute" in order to avoid summary judgment. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed.Cir.1987). The nonmovant may not rely upon its pleadings or conclusory allegations to demonstrate a factual dispute, but rather must set forth specific facts that establish an issue for trial, by affidavit or otherwise, such that the trier of fact could reasonably find in the nonmovant's favor. Bromley Contracting Co. v. United States, 15 Cl.Ct. 100, 105 (1988).

When considering cross-motions for summary judgment, the court may not grant summary judgment in favor of either party if disputes remain concerning material facts. Mingus Constructors Inc. v. United States, 812 F.2d 1387, 1391 (Fed.Cir.1987). "Rather, the court must evaluate each party's motion on its merits, taking care in each instance to

---

**9.** Regarding Count Three, the Court of Federal Claims lacks jurisdiction to grant a declaratory judgment or injunctive relief on the facts alleged. See Kanemoto v. Reno, 41 F.3d 641, 644–45 (Fed. Cir.1994); Marcinkowsky v. United States, 44 Fed.Cl. 610, 613 (1999), aff'd, 206 F.3d 1419 (Fed.Cir.2000).

draw all reasonable inferences against the party whose motion is under consideration." *Id.*

## II. Defendant's Cross–Motion For Summary Judgment

A. The Union Was Not Authorized to Waive, in a Collective Bargaining Agreement, Plaintiffs' Right to Seek a Judicial Remedy for Their Claims Based Upon Defendant's Alleged Violation of OPM Regulations Governing High Pay

■ Defendant argues that the BMTC Agreement precludes plaintiffs from pursuing their back pay claims in this court. Defendant maintains that the union, in the BMTC Agreement, waived plaintiffs' judicial remedies and plaintiffs are therefore limited to the procedures established by the collective bargaining agreement for the resolution of employment grievances.

In *Mudge v. United States*, 308 F.3d 1220 (Fed.Cir.2002) ("*Mudge II*"), the Federal Circuit held that Congress established a Federal employee's right to seek a judicial remedy for employment grievances in 1994 when it amended 5 U.S.C. § 7121(a)(1), a provision of the Civil Service Reform Act of 1978 ("CSRA"). *Mudge II*, 308 F.3d at 1227. That amendment provided that the grievance procedures set forth in a federal employee's CBA are "the exclusive administrative procedures for resolving grievances that fall within [the CBA's] coverage" rather than the "exclusive procedures" for grievance resolution, as the statute had previously provided. *Id.* (quoting 5 U.S.C. § 7121(a)(1) (2000)). The court held that its decision in *Carter v. Gibbs*, 909 F.2d 1452 (Fed.Cir.1990), was no longer applicable to the extent that it interpreted the prior language of section 7121(a)(1) to preclude a judicial remedy. *Id.* "In effect, the 1994 amendment lifted a statutory bar to

an individual member's invocation of a remedy in court." *Mudge v. United States*, 59 Fed.Cl. 527, 530 (2004) ("*Mudge III*"). The *Mudge II* court did not decide whether the terms of the CBA in question independently deprived the court of jurisdiction because the trial court had not decided the issue. *Mudge II*, 308 F.3d at 1233. *Mudge II* establishes, therefore, that plaintiffs have a right to seek a judicial remedy in this court, at least insofar as the terms of the BMTC Agreement do not abrogate that right.[10] Defendant's argument therefore requires the Court to address whether the union effectively waived plaintiffs' right to sue in this court when it agreed to the terms of the BMTC Agreement.

This court has previously considered whether a union is authorized to waive prospectively the right of individual federal employees to seek judicial redress for alleged violations of their statutory rights. In doing so, the court has considered whether it is proper to apply certain protections of individual employees' rights that have developed in private sector case law, given the additional safeguards that the CSRA provides for federal employees. *See generally Mudge III*, 59 Fed.Cl. at 532–35 (analyzing the applicability to federal employment disputes of the limitations imposed by federal courts on union power in the private sector). The *Mudge III* court described the D.C. Circuit's analysis of Supreme Court case law in the private sector, stating that "[u]nless the Congress has precluded his doing so, an individual may prospectively waive his own statutory right to a judicial forum, but his union may not prospectively waive that right for him," and that "absent congressional intent to the contrary, a union may not use the employees' individual statutory right to a judicial forum as a bargaining chip to be exchanged for some benefit to the group." *Id.* at 533 (quoting *Air Line Pilots Ass'n v. Northwest Airlines, Inc.*, 199 F.3d 477, 484 (D.C.Cir.

---

**10.** The United States Supreme Court is scheduled to consider whether 5 U.S.C. § 7121(a) precludes an employee from seeking direct judicial redress when the employee would otherwise have an independent basis for judicial review of his claims. The Court granted certiorari in *Whitman v. Department of Transportation*, 382 F.3d 938 (9th Cir.2004), *cert. granted,* —— U.S. ——, 125 S.Ct. 2962, 162 L.Ed.2d 886 (2005) (No. 04–

1131), in which the Ninth Circuit disagreed with the Federal Circuit's opinion in *Mudge II*. Argument in *Whitman* was held on December 5, 2005. The Eleventh Circuit, on the other hand, has expressly adopted the holding of *Mudge II*. *Asociacion de Empleados del Area Canalera v. Panama Canal Commission*, 329 F.3d 1235, 1241 (11th Cir.2003).

1999)).[11]  Applying this principle, the court found that because Congress evinced no intention to allow a union to bargain away a federal employee's right to a judicial remedy established by the 1994 amendment to the CSRA, 5 U.S.C. § 7121(a)(1), the union lacked the authority to waive Mr. Mudge's individual right to pursue his claim in court. *Id.; see also Curtis v. United States*, 59 Fed.Cl. 543, 548 (2004) ("In this case, Congress did not intend that an individual employee's right to bring suit in federal court could be lost through a collective bargaining agreement.  In fact, the 1994 amendment to the CSRA was intended to allow 'federal employees to seek redress of their grievances in court ....'" (quoting *O'Connor*, 308 F.3d at 1244)).  The Court concludes, therefore, that BMTC lacked authority in negotiating the collective bargaining agreement to waive plaintiffs' right to seek judicial redress for alleged violations of the regulations govern-

ing high pay.  *See Mudge III*, 59 Fed.Cl. at 533–34.

**B.  Even Assuming That the Union Was Authorized to Enter Into a Collective Bargaining Agreement that Waived Plaintiffs' Right to Seek a Judicial Remedy, the BMTC Agreement Did Not Do So**

Even assuming *arguendo*, however, that the union was empowered to waive prospectively plaintiffs' judicial remedies, the Court concludes that the terms of the BMTC Agreement did not, in fact, waive the plaintiffs' right to pursue, in a judicial forum, their back pay claims based upon the OPM regulations.  This court has recently held that a CBA's purported waiver of an individual federal employee's right to seek judicial redress is effective only if it is clear and unmistakable.  *See Curtis*, 59 Fed.Cl. at 549; *Mudge III*, 59 Fed.Cl. at 535; *see also Bull*

---

11.  As in this case, the *Mudge III* court was faced with defendant's argument that, pursuant to *O'Connor*, it was improper for the court to rely upon private sector case law in deciding whether the federal employees' union had waived its members' rights because federal workers' rights are appropriately safeguarded when vindicated by the negotiated grievance procedure crafted by the CSRA.  *See Mudge III*, 59 Fed.Cl. at 533–34; Def.'s Cross–Mot. at 16–19.  In *O'Connor*, the Federal Circuit stated that "private sector law is not controlling in the context of federal labor controversies."  *O'Connor*, 308 F.3d at 1242.  The *Mudge III* court addressed the Government's argument:

> The government errs, however, in failing to recognize what happens when a federal employee's grievances are *not* vindicated through the negotiated grievance procedure contained in the employee's collective bargaining agreement.  When a union declines, for example, to pursue a grievance of a unit member or to take that grievance to arbitration, such an employee has, by statute, no *administrative* recourse.  In effect, in that circumstance, the federal-sector employee is placed on the same footing as a private employee.

*Mudge III*, 59 Fed.Cl. at 534.  The court determined that although private sector case law is not controlling in the government context, it remains "persuasive, confirmatory authority" where a federal employee is in a similar situation as a private employee.  *Id.* Mr. Mudge's union did not pursue his pay-retention claim at all and declined to take his pay differential claim to arbitration after it had been denied.  *Id.* The court found that the union's inaction, combined with the denial of plaintiff's claim by his agency

and by other administrative fora, effectively denied him an administrative remedy.  *Id.; see also Curtis*, 59 Fed.Cl at 547 ("In this case, plaintiffs' claims have not been pursued by their union and they are left without an administrative remedy.").  Therefore, "[w]hen Mr. Mudge finally filed a complaint in this Court, he acted pursuant to his individual, statutory right, which exists independently of the grievance procedure contained in the collective bargaining agreement.  That right to seek judicial relief belongs to him, not his union."  *Mudge III*, 59 Fed.Cl. at 534.  Here, BMTC did pursue plaintiffs' grievance to the point of the Grievance Decision, which awarded high pay (plus interest) to plaintiffs for a period beginning 15 working days prior to the filing of the grievance, but there is a factual dispute as to how the union treated plaintiffs' claims beyond that point.  According to plaintiffs, the union declined to pursue the matter further: "BMTC did not challenge [Ms. Tallman's] decision, or request arbitration under the CBA."  Pls.' Proposed Findings of Uncontroverted Fact, ¶ 50.  According to defendant, "Mr. Aiken's signature on the 'decision' constituted the union's agreement that the grievance was resolved and the union would not proceed to arbitration.  The union did not seek arbitration."  Def.'s Proposed Findings of Uncontroverted Facts, ¶ 16.  In short, plaintiffs assert that the union refused to pursue their case after what amounted to a denial of the bulk of their claim for high pay, putting this case directly in line with *Mudge III*, in which the court held that Mr. Mudge had been denied an administrative remedy, while defendant asserts that the union settled plaintiffs' claims by agreeing to the Grievance Decision.

*v. United States*, 65 Fed.Cl. 407, 415 (2005) ("Even assuming, arguendo, that plaintiffs' prospective rights to overtime compensation under the FLSA could have been waived during the collective bargaining process, the court must determine whether plaintiffs unmistakably waived their rights."). These cases adopted the standard of a clear and unmistakable waiver from the Supreme Court's decision in *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), a private sector case holding that a CBA did not waive plaintiff's right to a judicial forum to pursue his claim under the Americans With Disabilities Act of 1990. *See Curtis*, 59 Fed.Cl. at 549; *Mudge III*, 59 Fed.Cl. at 534–35. Defendant again urges the court to diverge from this line of cases because the cases improperly relied upon decisions arising in the private sector context. In addition, defendant argues that the Federal Circuit's opinion in *O'Connor* does not support distinguishing between a prospective waiver of employees' rights in a CBA and the waiver of an accrued claim in a settlement agreement, which was approved in *O'Connor*. *See* Def.'s Cross–Mot. at 15–18. Again, although defendant is correct that private-sector case law is not controlling here, such precedent is persuasive in this case. In light of the 1994 amendment to the CSRA, which the Federal Circuit has interpreted to grant a judicial remedy in this context, the Court adopts, as did the *Curtis* court, the Supreme Court's holding that "the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a CBA." *Curtis*, 59 Fed.Cl. at 549 (quoting *Wright*, 525 U.S. at 80, 119 S.Ct. 391).

Applying this standard, the Court concludes that the BMTC Agreement did not contain a clear and unmistakable waiver of plaintiffs' right to a judicial remedy created by the 1994 CSRA amendment. Defendant asserts that the following language constitutes the waiver: "the procedures specified in [Article Thirty, Grievance Procedure] are the exclusive procedures available to employees, the Employer and the Council for resolving grievances which fall within its coverage." Def.'s Cross–Mot. at 13. As in the CSRA's definition, grievances under the BMTC Agreement include "[a]ny claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* The CBA in *Mudge III* similarly provided that the grievance procedure "shall be the exclusive procedure available to the parties and the employees in the unit for resolving grievances" and defined a grievance in substantially the same manner as the BMTC Agreement. *Mudge III*, 59 Fed.Cl. at 534–35. Finding that the exclusivity provision and the grievance definition did not "expressly and unmistakably waive the right to seek *judicial* redress," the court found that the language did not constitute an effective waiver. *Id.* at 535.

In *Curtis*, the CBA provided that the "grievance procedure is the only procedure available … for the adjustment of grievances." *Curtis*, 59 Fed.Cl. at 549. The court held that the CBA language did not preclude plaintiffs' FLSA claims because it did not "explicitly cover claims of individual statutory rights." *Id.* The *Curtis* court did emphasize, however, that the CBA did not explicitly make the particular requirements of the FLSA a contractual obligation subject to the grievance procedure. Stating that "a waiver of a statutory right must explicitly incorporate the statute's requirements," the court found that the CBA did not obligate employees to arbitrate their claims under the grievance procedure. *Id.* In this case, defendant points out that Article 10 of the BMTC Agreement incorporated the OPM schedule [12]

---

12. Here, the term "OPM schedule" refers to provisions that were formerly contained in Federal Personnel Manual ("FPM") Supplement 532–1, Appendix J. Those provisions were incorporated by Article 10 of the BMTC Agreement and set forth in full in Appendix II to the agreement. The identical provisions are now set forth in Appendix J to subchapter S8–7 of OPM's Operating Manual for the Federal Wage System–Appropriated Fund ("OPM Manual"). Along with 5 C.F.R. § 532.511 and OPM Regulatory Appendix A, subchapter S8–7 and Appendix J of the OPM Manual implement the requirement of 5 U.S.C. § 5343(c)(4) that OPM establish proper differentials for "duty involving unusually severe working conditions or unusually severe hazards." The high work provisions of both the OPM Manual's schedule and the former FPM schedule are identical to those in the schedule set forth in

pertaining to Environmental Differential Pay: "The CBA itself also recognizes that additional pay for high work is specifically contemplated by the CBA.... The CBA specifically annexes schedule J of the OPM regulations, which is the basis of plaintiffs's [sic] entitlement claim." Def.'s Reply Br. Supp. Def.'s Cross–Mot. Summ. J. ("Def.'s Reply") at 4. It is true that the BMTC Agreement's incorporation of the OPM schedule makes this case somewhat different from *Curtis*. Here, defendant is correct in its assertion that the CBA made the specific requirements of the OPM regulations governing high pay a contractual obligation subject to the grievance procedures.

The BMTC Agreement, however, could not have waived plaintiffs' right to a *judicial remedy* to vindicate those claims because the Agreement was executed before Congress created that right. Defendant contends that "the language and purpose of the CSRA," in combination with the BMTC Agreement's establishment of the negotiated grievance procedures as the exclusive means of employment dispute resolution, mandate a finding that the BMTC Agreement waived plaintiffs' right to seek back pay in this court. *See* Def.'s Cross–Mot. at 14. This argument is undermined by the fact that the BMTC Agreement, which took effect in 1987, predates the very amendment to the CSRA that first established the employees' right to a judicial forum. Although defendant argues that the union and the agency were as empowered to waive plaintiffs' judicial remedy prior to 1994 as they are today, Def.'s Cross–Mot. at 19, this court has consistently held to the contrary. "The language [of the CBA] merely incorporated applicable law existing at the time and cannot serve as a waiver of a future statutory right." *Curtis*, 59 Fed.Cl. at 550. "The bargaining agreement's exclusivity provision cannot evidence a conscious intent by the parties to divest an individual right that did not yet exist at the time the

agreement was written." *Mudge III*, 59 Fed.Cl. at 535.[13]

Here, as in *Mudge III*, "there is nothing in the bargaining agreement that explicitly purports to divest an individual unit member of the right to a judicial forum." *Mudge III*, 59 Fed.Cl. at 535. Although the right to Environmental Differential Pay was apparently contemplated by the union and PSNS in crafting the BMTC Agreement, plaintiffs' right to seek judicial enforcement of the differentials did not exist and therefore could not have been subject to the parties' agreement negotiated in 1987. The Court holds that the BMTC Agreement's exclusivity provision does not preclude plaintiffs from pursuing their back pay claims in this forum.

C. The BMTC Agreement Does Not Render Untimely Plaintiffs' Claims in This Court Asserting Entitlement to Environmental Differential Pay Under OPM Regulations

Defendant argues that the terms of the BMTC Agreement limit plaintiffs' claim in this court because, until the filing of the grievance, plaintiffs did not comply with the Agreement's requirement, in Article 10, section 1004, that they notify their supervisors that they believed they were entitled to differential pay and because the Agreement requires, in Article 30, section 3002, that a grievance be initiated within 15 working days of the occurrence from which it arose or from the time the grievant knew or should have known that he had been aggrieved. Def.'s Cross–Mot. at 20–21, App. at 45, 47. Because the Court has determined that the BMTC Agreement does not waive plaintiffs' right to pursue a judicial remedy for their alleged entitlement under OPM regulations governing high pay, plaintiffs' claims in this court are likewise not rendered untimely by the terms of the Agreement. For the purposes of plaintiffs' judicial remedy, timeliness is determined by the statute of limitations

OPM Regulatory Appendix A. *See* "Background" section, *supra* at 2.

**13.** Defendant also notes that "the relevant provisions of the CBA did not change in the most recent CBA negotiated by the parties in 2003."

Def.'s Cross–Mot. at 19. This observation may be relevant to an analysis of the 2003 agreement's exclusivity provision, but it is inapposite as to whether the 1987 BMTC Agreement waived plaintiffs' rights to a judicial remedy.

governing actions in this court, 28 U.S.C. § 2501 (2000).

Defendant further urges that to the degree plaintiffs' claims are untimely under the BMTC Agreement this Court should find them untimely under the Back Pay Act, which requires "a timely appeal or an administrative determination" as a prerequisite to recovery. *Id.* at 21–22 (quoting 5 U.S.C. § 5596(b)(1)). The statute's implementing regulations state that the "timely appeal" requirement is met not only when a grievance under a collective bargaining agreement is accepted by an appropriate authority as timely, but also when an employee initiates "a claim against the Government of the United States ..." and "[a]n appropriate authority accepts that ... claim ... as timely filed." 5 C.F.R. § 550.804(b) (2005). "Appropriate authority means an entity having authority in the case at hand to correct or direct the correction of an unjustified or unwarranted personnel action, including ... a court ...." § 550.803. Having established in Section II. A. and B., *supra*, that the Court has authority to adjudicate plaintiffs' claims, the Court concludes that plaintiffs' claims are timely at least to the extent that they are not barred by the statute of limitations set forth in 28 U.S.C. § 2501.[14]

> **D. There Are Genuine Issues of Material Fact With Respect to Whether the Grievance Decision Constituted an Accord and Satisfaction**

■ In *O'Connor v. United States*, decided the same day as *Mudge II*, the Federal Circuit held that a settlement agreement between a union and an agency, pertaining to employment grievances of federal workers, can operate as a valid accord and satisfaction of the employees' claims, thereby barring further litigation of those claims. *See O'Connor*, 308 F.3d at 1244. Defendant argues that plaintiffs' claims are barred by the doctrine of accord and satisfaction because they were settled during the negotiated grievance stage of the administrative process. Def.'s Cross–Mot. at 22. For the purposes of defendant's cross-motion for summary judgment,[15] the defendant has not demonstrated the absence of genuine issues of material fact such that it is entitled to judgment as a matter of law on this defense.

An accord and satisfaction occurs when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." *O'Connor*, 308 F.3d at 1240 (quoting *Case, Inc., v. United States*, 88 F.3d 1004, 1011 n. 7 (Fed.Cir.1996)). A valid accord and satisfaction consists of four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Id.* Accord and satisfaction is an affirmative defense, upon which defendant has the burden of persuasion. *See O'Conner v. United States*, 60 Fed.Cl. 164, 168 (2004).

Plaintiffs appear to concede the elements of proper subject matter and competent parties: "Plaintiff[s] don't contest that the union and the Shipyard ... could have entered into a settlement agreement.... But they didn't, and that brings the Shipyard's accord and satisfaction defense to an end." Pls.' Reply Supp. Mot. Partial Summ. J. and Opp'n Def.'s Cross–Mot. Summ. J. ("Pls.' Reply") at 16–17. Rather, plaintiffs argue that there was no meeting of the minds between the parties and appear to implicitly contest whether the union remitted any consideration in exchange for the shipyard's concessions in the Grievance Decision. *See Pls.' Reply* at 15–20. The Court agrees that the subject matter of plaintiffs' claims would be appropriate for accord and satisfaction and

---

**14.** For the purposes of 28 U.S.C. § 2501, "[a] claim for periodic installments of back pay allegedly due is a continuing claim involving multiple causes of action, each one arising at the time the Government fails to make the payment alleged to be due." *Batten v. United States*, 220 Ct.Cl. 327, 330 n. 10, 597 F.2d 1385 (1979) (citing *Daniels v. United States*, 187 Ct.Cl. 38, 40 n. 1, 407 F.2d 1345 (1969); *Burich v. United States*, 177 Ct.Cl. 139, 366 F.2d 984 (1966), *cert. denied*, 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182 (1967), *and reh'g denied*, 389 U.S. 998, 88 S.Ct. 486, 19 L.Ed.2d 504 (1967)).

**15.** The existence of genuine issues of material fact with respect to the defense of accord and satisfaction also requires the denial of plaintiffs' motion for partial summary judgment on liability, as discussed in Section III. A., *infra*.

that BMTC and PSNS were competent parties to reach such a settlement. The Court now turns to whether genuine issues of material fact exist as to whether there was a meeting of the minds and whether consideration was present.

### 1. Meeting of the Minds

"Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances." *Texas Instruments, Inc. v. United States*, 922 F.2d 810, 815 (Fed.Cir. 1990). Meeting of the minds "is a question of law, and a court's finding should be primarily based on the intent of the parties." *Ahrens v. United States*, 62 Fed.Cl. 664, 671 (2004) (citing *Texas Instruments*, 922 F.2d at 815; *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988)).

Since *O'Connor*, this court has addressed the issue of accord and satisfaction in the context of federal employee grievances in *Ahrens* and in *Addison–Taylor v. United States*, 63 Fed.Cl. 345 (2004). In *Ahrens*, the court considered whether a global memorandum of understanding ("MOU") between the union and the agency constituted an accord and satisfaction of individual plaintiffs' FLSA claims. *See Ahrens*, 62 Fed.Cl. at 666. The court found that there was no accord and satisfaction as to 75 individuals who were not grievants because the parties clearly intended that the MOU would only cover grievants. *See id.* at 669–71. As to the 20 grievant plaintiffs, the court found that the MOU was a valid accord and satisfaction. On the issue of meeting of the minds, the court determined that although the MOU did not expressly waive the grievants' right to file future individual claims, "there was sufficient expression in the MOU to make it unreasonable for [the grievants] not to realize that the performance offered by the government was made in full satisfaction of their claims." *Id.* at 672. The court also concluded that the waiver of claims by the union in the MOU was "sufficient to show that the parties also intended to waive any individual claims by the 20 grievant Plaintiffs," and a meeting of the minds was therefore established. *Id.* Accordingly, the court granted defendant's motion for summary judgment as to the claims of the grievant plaintiffs. *Id.* at 673. In *Addison–Taylor*, the court held that a settlement agreement concerning FLSA overtime pay was a valid accord and satisfaction. *Addison–Taylor*, 63 Fed.Cl. at 351–52. The settlement agreement in that case contained, *inter alia*, the following language: "The $5,285,000 payment represents all back pay, interest, liquidated damages and attorneys' fees and costs for the positions [covered by the agreement] incurred in the Union grievances up to the date this Agreement is signed." *Id.* at 350. The court granted defendant's motion for summary judgment in part, concluding that the plain meaning of the language just quoted defeated plaintiffs' assertion that their claims were not resolved by the settlement agreement. *See id.*

Defendant argues that this case is akin to *Ahrens* and *Addison–Taylor*, and that there is no genuine issue of material fact as to whether there was a meeting of the minds, because the Grievance Decision was, under the totality of the circumstances, not a decision but rather a settlement agreement in satisfaction of plaintiffs' claims. Def.'s Cross–Mot. at 28. As support for its position, defendant points to the fact that substantial negotiations occurred between PSNS management, represented by Mr. Mark Winkler, and BMTC, represented by Mr. Joe Aiken, prior to the signing of the Grievance Decision. Mr. Winkler states that he met with Mr. Aiken no less than 12 times in a bilateral, interactive process aimed at settling the dispute. *Id.* Mr. Winkler and the union also negotiated the amount of high pay to which each worker was entitled. He states that the Grievance Decision "was in fact a negotiated settlement agreement that involved more than just the written document. For example, it also included the specific amount of back pay for each grievant." Def.'s Cross–Mot., App. at 6. Defendant also emphasizes that Mr. Aiken signed the Grievance Decision contemporaneously with Ms. Tallman: "There simply would have been no conceivable reason for Mr. Aiken to have signed the decision other than to signify that the parties had mutually agreed to resolve the dispute following the negotiations that he and management had recently concluded." Def.'s Reply at 8. Defendant also

points to an August 30, 2000 Unfair Labor Practice Charge filed by BMTC that refers to the Grievance Decision specifically as "a negotiated settlement agreement" and a 2002 settlement agreement in which the union refers to the Grievance Decision as "the high pay grievance settlement" as evidence that the union understood the Grievance Decision to be an agreement. Def.'s Cross–Mot. at 29.

Plaintiffs first respond by emphasizing that the language of the Grievance Decision indeed reads like a decision. Written in the first-person voice of Ms. Tallman, it contains language such as "I have reached the following conclusions" and "I conclude that this grievance ... is untimely." Pls.' Mot. Partial Summ. J. ("Pls.' Mot.") at 29; Pls.' Reply at 17–18. Plaintiffs further contend that Mr. Aiken's signature on the Grievance Decision is meaningless. "Since the document signed is not an agreement, and contains no language expressing an agreement, the signature adds nothing to the document.... While extrinsic evidence may be admissible to explain a contract's terms, such evidence cannot make a contract out of a document that-on its face and by its terms-is not one." Pls.' Mot. at 30. Plaintiffs also argue that defendant cannot identify any release or waiver of claims by the union on behalf of the plaintiffs. They assert that the Grievance Decision itself contains no language purporting to release any right of the grievants. Pls.' Reply at 18. In addition, plaintiffs point to Mr. Winkler's statement in his deposition that neither he nor Ms. Tallman indicated to BMTC that a release of future employee claims was a condition of the high pay award. Id. at 18–19. Finally, plaintiffs construe Mr. Winkler's discussions with the union as "unilaterally directed" by the Grievance Decision, which provided that "[m]anagement will work with the union to develop [a] means of determining the appropriate amount of back pay for each grievant." Id. at 19. Plaintiffs argue that these factors distinguish this case from *Ahrens* and *Addison–Taylor*, in which the parties had executed agreements containing language unambiguously indicating that the Government's performance was offered in satisfaction of the employees' claims. Id. at 19–21.

In response to plaintiffs' assertion that there was never any identifiable waiver of plaintiffs' claims, defendant asserts that Section III of the Grievance Decision constitutes a waiver of plaintiffs' back pay claims because that section expressly mentions that the grievants requested back pay for the entire time they had worked in Shop 64 and states that such back pay will not be paid because the grievance was untimely. Def.'s Reply at 9. "The fact that there is no language stating a specific waiver is a non-issue ... because the agreement specifically rejects the claim that back pay be retroactive to when the grievant started to work in Shop 64. As this was a fundamental part of the agreement, there was no need to include a separate or more specific waiver." Id. Defendant asserts that but for the existence of the settlement, there would have been no reason for the union not to pursue arbitration or otherwise seek to obtain the bulk of the employees' claim for back pay. Id. at 8.

Plaintiffs are correct that the Grievance Decision, on its face, appears to be a decision by Ms. Tallman rather than a mutual settlement agreement. On the other hand, defendant's argument that there is more to the parties' interactions than is reflected in the document is not entirely without merit. While the Court agrees with plaintiffs that Mr. Aiken's signature cannot simply transform an administrative decision into a settlement agreement, the signature does undeniably inject a degree of ambiguity into the Grievance Decision and raises the possibility that its contents were part of a bargained-for exchange. Indeed, plaintiffs' argument that the signature is meaningless seems somewhat circular, *i.e.*, plaintiffs appear to contend that the signature cannot be evidence that the document is an agreement because the document "on its face" is not an agreement. (Also, the signature appears "on its face" and is not itself extrinsic evidence.) This ambiguity requires further factual development regarding the parties' intent.

As plaintiffs have stated, however, defendant has not shown that the union intended to waive the future individual claims of the members of the bargaining unit when Mr.

Aiken signed the Grievance Decision. Defendant asserts that Section III of the decision, which identifies plaintiffs' claim for high pay for their entire tenure at Shop 64 and specifically denies that claim to the extent that it sought to recover high pay from a date prior to 15 working days before the filing of the grievance on April 13, 1999, constitutes a sufficiently clear statement of release to obviate the "need to include a separate or more specific waiver." Def.'s Reply at 9; Def.'s Cross–Mot., App. at 21–22. Even if the language of Section III were so unambiguous that plaintiffs could not reasonably fail to understand that the Government was acting in full satisfaction of their claims, as was the case in *Ahrens* and *Addison– Taylor*, defendant's argument still relies upon the conclusion that the document containing the language was an *agreement*. Although Mr. Aiken's signature on the Grievance Decision raises an ambiguity as to this point, and the union's prior participation in discussions and subsequent decision not to pursue the employees' claim for additional back pay in arbitration are some evidence that an agreement occurred, the Government has not established that there is no genuine issue of material fact on this point for the purposes of its cross-motion. Indeed, the evidence before the Court is inconclusive. Although Mr. Winkler has declared unambiguously that the "decision was in the nature of a compromise in settlement of the union grievance," Pls.' Mot., App. at 62, plaintiffs point out that he also stated in his deposition that neither he nor Ms. Tallman specifically told the union that an agreement not to pursue a claim for additional high pay was a condition of the shipyard's high pay award. Pls.' Reply at 19. In addition, Ms. Tallman, who signed the Grievance Decision, declared that she "was simply trying to make a management decision that resolved a sizeable union grievance." Pls.' Mot., App. at 70. The Court has heard nothing from the union concerning its view of the Grievance Decision and the surrounding negotiations, nor has defendant provided any concrete evidence of the union's intent in signing the Grievance

Decision. For the purposes of defendant's cross-motion, there exist genuine issues of material fact with respect to the question whether there was a meeting of the minds.

### 2. Consideration

"Consideration is present if there is a 'detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor.'" *Ahrens*, 62 Fed.Cl. at 671 (quoting *Estate of Bogley v. United States*, 514 F.2d 1027, 1033, 206 Ct.Cl. 695 (1975)). Defendant argues that the Government "agreed to a new formula for the payment of future high pay,"[16] agreed to pay back pay to all grievants and 35 additional union members, and employed a "generous" approach in calculating the individual shipwrights' high pay entitlements. Def.'s Cross–Mot. at 30. In return, "the union agreed that back pay would only go back to 15 days prior to the filing of the grievance" and "waived its rights for back pay from the time that the member started to work at the shipyard." *Id.* at 30– 31. Although plaintiffs do not explicitly address this element, their assertions that the union neither agreed to the 15–day limitation nor released any claims to further back pay, as discussed above, are also relevant to the existence of consideration. Absent such an agreement or release, it is not clear what consideration the union would have remitted in exchange for the Government's concessions in the Grievance Decision. Because the Court finds that defendant has not established the absence of a genuine factual issue as to whether the union agreed to the limitation of back pay and a release of future claims, the Court must also find that genuine issues of material fact exist regarding what, if any, consideration flowed from the union to the Government. Defendant's cross-motion for summary judgment must be denied.

### III. Plaintiffs' Motion For Partial Summary Judgment

The Court now considers plaintiffs' motion for partial summary judgment on liability on Count One of the amended complaint, alleging that plaintiffs are entitled to back pay

---

**16.** As noted above in the "Background" section, *supra* at 4, PSNS's "new formula" for future payment of high pay appears to be less generous to employees than the requirements of the OPM regulations governing high pay and of the BMTC Agreement.

under the Back Pay Act for defendant's failure to pay a differential for high work as defined in OPM Regulatory Appendix A, part I.2(b)(1) and (b)(2), and the BMTC Agreement. Plaintiffs' motion for partial summary judgment must be denied because genuine issues of material fact exist as to whether the Grievance Decision embodied an accord and satisfaction. Furthermore, the Court concludes that there are genuine issues of material fact concerning plaintiffs' entitlement to high pay.

A. Genuine Issues of Material Fact Concerning Accord and Satisfaction Preclude Partial Summary Judgment for Plaintiffs on Liability

As stated above in Section I, when considering cross-motions for summary judgment, the court may not grant summary judgment in favor of either party if disputes remain concerning material facts. *Mingus*, 812 F.2d at 1391. A fact is material if it might affect the outcome of the suit. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Here, if defendant were to establish the existence of a meeting of the minds and consideration, defendant would thereby establish an accord and satisfaction that would preclude recovery by plaintiffs in this case. Although accord and satisfaction is an affirmative defense upon which defendant must bear the burden of proof, the Court finds that for the purposes of plaintiffs' motion, Mr. Aiken's signature on the Grievance Decision, the partic-

ipation of the BMTC union in discussions with PSNS prior to the execution of the Grievance Decision, and the union's subsequent election not to pursue arbitration or otherwise seek to recover significant portions of the back pay claims of members of the collective bargaining unit, establish that there are genuine issues of material fact regarding the existence of an accord and satisfaction.[17] *See* Section II. D., *supra.* Plaintiffs' motion for summary judgment must therefore be denied. *See* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE § 2734 ("A claimant is entitled to summary judgment only when *no genuine* issue of material fact exists, the papers on the motion demonstrate the right to relief, and every one of the defenses asserted legally are insufficient. Since a single valid defense may defeat recovery, however, claimant's motion for summary judgment should be denied when any defense presents significant fact issues that should be tried.").

B. Genuine Issues of Material Fact Remain Concerning Plaintiffs' Entitlement to High Pay

■ Not only are there genuine issues of material fact with respect to the defense of accord and satisfaction, but the Court concludes that there are also genuine issues of material fact with respect to plaintiffs' *prima facie* case. There is no dispute regarding the definition of high work. As set forth in

17. Defendant's reliance upon the defense of accord and satisfaction is contained in the portion of defendant's brief setting forth defendant's arguments in support of its cross-motion for summary judgment and not in the portion of its brief setting forth defendant's arguments in opposition to plaintiffs' motion for partial summary judgment. Nevertheless, in analyzing plaintiffs' motion for partial summary judgment, the Court treats accord and satisfaction as an affirmative defense of the nonmovant. The Supreme Court has stated that "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Such a situation negates the possibility of a genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Id.* at 322–23, 106 S.Ct. 2548. Where, as here, the nonmovant has the ultimate burden of persuasion on its affirmative defense, the movant may properly move for summary judgment on that defense "in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file' " and the burden of production then shifts to the nonmovant to "go beyond the pleadings ... [to] designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2727 (3d ed.1998 & Pocket Pt. 2005) (discussing *Celotex*). Assuming *arguendo* that plaintiffs, by their motion, have succeeded in shifting the burden of production to defendant with respect to its affirmative defense of accord and satisfaction, defendant has met that burden by presenting evidence establishing that there are genuine factual issues for trial as to each of the contested elements of that defense.

the "Background" section, *supra* at 3, for the purposes of Count One, high work includes:

b. Working at a lesser height [than 100 feet]:

(1) If the footing is unsure or the structure is unstable; or

(2) If safe scaffolding, enclosed ladders or other similar protective facilities are not adequate (for example, working from a swinging stage, boatswain chair, a similar support); [18]

OPM Reg.App. A, pt. I.2.

Plaintiffs assert that they worked at heights below 100 feet where the footing was unsure. They aver that, when constructing staging, "Shipwrights do not work on finished scaffolding with floors that are fastened to the frame and with guard rails around the edges. They work, at best, on planks that are not fastened to the frame or to each other." Pls.' Mot. at 19. Plaintiffs state that their footing often consists of narrow surfaces, including "(1) the 2–inch pipe frame [of the staging] itself; and (2) 12–inch planks resting loosely on the frame side by side." *Id.* The frame itself is unfinished for a time while the shipwrights work on it, without diagonal reinforcements. *Id.* The work is "particularly dangerous," *Id.* at 19, for shipwrights who work on the "leading edge," *i.e.,* "the incomplete, uppermost level of the structure." *Id.* at 4. Plaintiffs further allege that the protective facilities were inadequate and often nonexistent. *Id.* at 18. "Shipwrights clambered up and down staging using open ladders and the frame of the staging itself. Through March 23, 1999, they worked without any fall protection whatsoever." *Id.* at 18–19.

Plaintiffs allege that they were not paid for high work performed before March 23, 1999. *Id.* at 19. They assert that PSNS refused to pay an environmental differential for work performed below 100 feet and that management limited high pay exclusively to work performed at heights above 100 feet or in a man-lift. *Id.*

In support of their position, all five plaintiffs have declared that they performed work on the leading edge during the construction of staging at heights below 100 feet. Pls.' Mot., App. at 5, 13, 21, 29, 36–37. They state that when working on the leading edge, it is particularly difficult to climb up to the level they are assembling because it requires crawling up the staging onto the work planks. *Id.* When a staging exceeds 25 feet in height, the shipwrights attach an unenclosed ladder. *Id.* at 5, 13, 21, 29, 37. The plaintiffs all state that when building levels of the staging off the ground or deck, they usually set two 12–inch planks side-by-side to stand on while working, and that these planks are not fastened to the frame so that they can readily be moved. *Id.* at 4–5, 12–13, 20–21, 28–29, 36. Each plaintiff declares that PSNS did not require fall protection before 1999 and that the plaintiffs did not use such protection. *Id.* at 7, 15, 23, 31, 39. They state that it is impossible for shipwrights on the leading edge to "tie in" to the structure because there is nothing there to tie into until they build it. *Id.* Plaintiffs further state that even at lower levels, the available fall protection (namely, a lanyard tying the workers' harness to the frame of the staging) is of limited value because it creates a trip hazard and must be continually hooked and unhooked to allow movement along the staging, and because the drop permitted by a fallen worker's lanyard would still present significant danger to the worker. *Id.*

The five plaintiffs indicate that they only recall receiving high pay when they worked in a man-lift or at heights of over 100 feet. *Id.* at 8, 16, 24, 32, 40. When they asked management about receiving high pay for work on staging below 100 feet, including leading-edge work and work without fall protection, management informed them that high pay was not available for such situations and that high pay was only available for work above 100 feet or in a man-lift. *Id.* Plaintiffs also point to the following statement in the deposition of Mr. Winkler, who was the Gen-

---

**18.** Although the definition of high work is not disputed, defendant asserts, without elaboration, that the provision for high pay where safe scaffolding, enclosed ladders, or other protective fa-cilities are not adequate only applies "to persons who work on the scaffolding after it has been completed." Def.'s Cross–Mot. at 31–32 n. 7. The basis of this assertion is unclear.

eral Foreman of Shop 64 from October 1997 to December 2000:

> Shipwrights have not been paid an Environmental Pay Differential for High Work except in limited circumstances. Pay for High Work has been authorized for work that is at heights equal or higher than 100 feet, and it has been authorized for work on staging during difficult weather conditions, for example, periods of high wind. Also, pay for High Work has been authorized for all trades when an employee is working from inside a basket of a hydraulic "manlift."

Pls.' Mot. at 19–20. According to plaintiffs, PSNS thereby admitted that shipwrights performed high work before March 23, 1999 and that PSNS did not pay them high pay for all of that work.

In opposition to plaintiffs' motion, defendant argues that there are issues of material fact regarding whether the five plaintiffs are entitled to high pay for work below 100 feet, centering upon "whether the footing was unsure or the structure unstable." Def.'s Cross–Mot. at 32. As to the stability of the structure, defendant disagrees with plaintiffs' statement that working on scaffolding inside a ship (metal on metal) is "akin to working on ice." *Id.* Defendant avers that in such situations the staging "is braced and therefore does not move." *Id.* at 32, App. at 2 (Winkler 2d Decl. ¶¶ 6–7). Defendant asserts that the same is true for staging on sloped surfaces. *Id.*

Regarding shipwrights' unsure footing, defendant emphasizes that, according to Mr. Winkler, they are given extensive training on leading edge work and safety:

> Their job is to erect and dismantle scaffolding. They are not permitted to do leading edge work if they have not been properly trained and supervised. Thus, while the footing might be unsure for someone with no training or experience, it is sure for those shipwrights selected to do leading edge work, and especially for the vast majority of scaffoldings that are twenty feet high or less.

*Id.* at 32 (citations omitted). Defendant further asserts that shipwrights who are passing up planks or building material "are often standing on planks which have been secured." *Id.* Defendant concludes that a shipwright's footing is not unsure, even when working on the leading edge.

Although the Court does not decide the issue of plaintiffs' entitlement here, defendant's argument that the shipwrights' training can negate an entitlement to high pay based upon unsure footing is unconvincing. The fact that plaintiffs are extensively trained to properly deal with unsure footing does not make the footing any less unsure. Plaintiffs are correct that defendant's argument in this regard seems to be a variation of the proposition, which defendant rightly abandoned, that high work is inherent in shipwrights' duties and therefore does not warrant differential pay when performed by a shipwright. *See* Pls.' Reply at 22–23. The regulations (and, by incorporation, the collective bargaining agreement) provide simply that workers who perform work at heights below 100 feet where the footing is unsure are entitled to high pay. OPM Reg.App. A, pt. I.2(b)(1). The plaintiffs' training is irrelevant to the issue of their entitlement under the high work provisions. Indeed, the very need for such training appears to underscore the hazardous nature of the work. As plaintiffs note, Mr. Winkler stated that the Shipyard's fall safety instructions allow "only shipwrights to work on incomplete staging without full fall protection." Def.'s Cross–Mot., App. at 4; Pls.' Reply at 22. The exclusiveness of this policy is further evidence that shipwrights who work above the ground on unfinished staging face hazardous conditions. Furthermore, although defendant asserts that shipwrights who are passing materials up the staging often stand on planks which have been secured to the frame, Def.'s Cross–Mot. at 32, this observation does not apply to shipwrights doing leading edge work and also appears to conflict with Mr. Winkler's deposition testimony that planks are only secured in a small percentage of cases during the construction of staging. *See* Pls.' Reply at 24.

Defendant proceeds to note that "many of the employees" work on the ground and are never entitled to high pay. *Id.* at 33. This statement, while true, is similarly unavailing

with regard to the five plaintiffs in this case. Each plaintiff here has attested to the fact that he has worked above the ground and has specifically stated that he has done leading edge work.[19] On the other hand, plaintiffs' substantially identical declarations, although generally detailed and helpful, are in certain respects not sufficiently specific to establish that there are no genuine issues of material fact concerning the work each plaintiff actually performed. For example, further evidence is needed to determine whether the conditions plaintiffs describe in their declarations (*e.g.*, standing on unsecured aluminum planks), in fact constitute "unsure footing."[20] As noted *supra* at 21, defendant disputes (by way of Mr. Winkler's second declaration) plaintiffs' assertions concerning the instability of the structure. Furthermore, plaintiffs' submissions provide very little specific information about the heights at which each plaintiff actually worked. As a general matter, more specific evidence concerning plaintiffs' working conditions is required in order to determine whether they performed high work for which they were not paid between April 13, 1993 and March 23, 1999. Accordingly, the Court declines to resolve the issue of plaintiffs' entitlement on summary judgment because, as set forth in Section III. A., *supra*, plaintiffs' motion for partial summary judgment must be denied on other grounds and because a trial is necessary in order to resolve factual disputes regarding plaintiffs' entitlement. *See Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505 ("Neither do we suggest that ... the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."). The issue of plaintiffs' entitlement to high pay will therefore remain open for resolution at trial. *See* 10A CHARLES ALAN WRIGHT, AR-THUR R. MILLER & MARY KAY KANE § 2712 ("[T]he denial of summary judgment does not preclude either party from raising at trial any of the issues dealt with on the motion. This is because a denial of summary judgment is not a decision on the merits; it simply is a decision that there is a material factual issue to be tried.").

## CONCLUSION

For the reasons set forth above, the Court concludes that the BMTC Agreement does not preclude plaintiffs from seeking a judicial remedy or render untimely plaintiffs' claims based on the OPM regulations; genuine issues of material fact exist concerning whether the Grievance Decision embodies an accord and satisfaction barring plaintiffs' back pay claims; and similarly, genuine issues of material fact exist, and must be resolved at trial, regarding plaintiffs' entitlement to Environmental Differential Pay for high work. Plaintiffs' motion for partial summary judgment is therefore DENIED, and defendant's cross-motion for summary judgment is likewise DENIED.

The Court anticipates convening a status conference in the near future to consider the nature and timing of further proceedings in this case.

IT IS SO ORDERED.

---

**19.** Although the Court does not treat the Grievance Decision as an admission by PSNS for the purposes of plaintiffs' motion, the spreadsheets submitted by defendant in connection with the Grievance Decision indicate that each of the five plaintiffs in this case performed substantial hours of high work during the period covered by the Grievance Decision. *See* Def.'s Cross–Mot., App. at 14–18.

**20.** Plaintiff asserts that "[t]he Shipyard concedes, as it must, that work on unsecured, nar-row planks constitutes unsure footing, at least for the rest of us." Pls.' Reply at 22. Defendant actually states that "while the footing might be unsure for someone with no training or experience, it is sure for those shipwrights selected to do leading edge work...." Def.'s Cross–Mot. at 32. Although the Court is not swayed by defendant's training-based arguments regarding unsure footing, defendant's statement that "the footing might be unsure" does not constitute a concession of the point.